976 P.2d 1229 (1999)
137 Wash.2d 712
STATE of Washington, Petitioner,
v.
Michael A. JACKSON and Laurinda J. Jackson, and each of them, Respondents.
No. 66220-7.
Supreme Court of Washington, En Banc.
Argued September 22, 1998.
Decided April 15, 1999.
*1230 Norm Maleng, King County Prosecutor, James S. Whisman, Deputy, Seattle, for Petitioner.
Richard R. Tassano, Thomas M. Kummerow, Washington Appellate Project, Jeanette Brinster, Northwest Defenders Assoc., Mark V. Watanabe, Seattle, for Respondents.
ALEXANDER, J.
A jury in King County Superior Court found Michael and Laurinda Jackson guilty of the second degree felony murder of their foster child, Breighonna Moore. The Jacksons each appealed their convictions to Division One of the Court of Appeals, which held that the trial court committed reversible error by including a "duty exists for a parent to come to the aid of their small children" element in its instruction to the jury regarding accomplice liability. It also concluded that there was insufficient evidence to support the allegation that the Jacksons committed one of the two alleged predicate felonies, first degree criminal mistreatment. Accordingly, the Court of Appeals reversed the trial court and remanded for a new trial based only on the allegation that the Jacksons committed the predicate felony of second degree assault. See State v. Jackson, 87 Wash.App. 801, 804, 809-19, 944 P.2d 403 (1997), review granted, 135 Wash.2d 1008, 959 P.2d 127 (1998). THE STATE PETITIONED This court for review and we granted it. the issues presented by its petition are whether the Court of Appeals erred in concluding that: (1) the trial court misstated the law in its jury instruction defining accomplice liability; (2) the instructional error was not harmless; and (3) the evidence produced at trial did not support the predicate felony of criminal mistreatment. We also granted Laurinda Jackson's cross-petition for review in which she claims that the Court of Appeals erred in concluding that there was sufficient evidence to support her conviction. We affirm the Court of Appeals in all respects.

FACTS
In June of 1992, Michael and Laurinda Jackson began the process to become foster parents. In furtherance of that effort, the Jacksons agreed to abide by the policies of the Washington State Department of Social and Health Services (DSHS), including its requirement that foster parents refrain from inflicting corporal punishment upon foster children placed in their care. In November of 1992, the Jacksons received a foster child, two-year-old Breighonna Moore, from DSHS.
*1231 Shortly thereafter, they received another foster child, an infant boy.
In the early morning hours of March 12, 1993, Michael Jackson drove Laurinda Jackson from their home to her place of employment. Michael, who was accompanied by Breighonna and the Jacksons' other foster child, then returned home. Michael spent the remainder of the morning with the children at their home and at a park. At about noon that day, Michael drove Breighonna to the Valley Medical Center in Renton, Washington. Upon his arrival at Valley Medical, Michael told an emergency medical technician that his "daughter" had been "swinging on a swing and had fallen and hit her head, and she wasn't breathing very well." Videotape Recorded Proceedings (VRP) at 68.
Breighonna was immediately taken to the emergency room at Valley Medical where she was examined by Dr. Edward Bigler. His examination revealed that Breighonna exhibited the following signs of injury: a growing contusion on her forehead; bruises on both ears; a faint bluish mark in the lower abdomen; discoloration on her buttocks; and an abrasion on her vagina. Bigler also noticed that Breighonna's right pupil was enlarged, and that neither of her eyes responded to light. After completing his initial examination, Bigler concluded that Breighonna was in critical condition as a result of having suffered a "very serious injury" to the brain. VRP at 19.
Bigler and other staff persons then questioned Michael about how Breighonna's injuries occurred. Michael indicated that while Breighonna was playing on a swing in the park, he turned his back for a moment, and when "he turned around [he] found her lying unconscious below the swing." VRP at 34. Dr. Bigler concluded that Michael's story about how Breighonna had fallen from a swing was inconsistent with the injuries he observed. He, therefore, asked the hospital's emergency intervention team to contact the Children's Protective Service.
The staff at Valley Medical eventually determined that Breighonna's condition necessitated her transfer to Harborview Hospital in Seattle. Before transferring the child to Harborview, Bigler advised personnel at that hospital that there was a Possibility of child abuse.
Upon Breighonna's arrival at Harborview during the late afternoon of March 12, Dr. Valerie Newman evaluated the child. She noted that Breighonna was still unconscious and unresponsive. Newman consulted with several other staff physicians, and together they reached a consensus that surgical intervention would be futile and that Breighonna was going to die. At about midnight Newman met with the Jacksons and informed them that she did not expect Breighonna to live through the morning. She then inquired of them how Breighonna had suffered her injuries. In response, Michael Jackson reiterated what he had told Dr. Bigler at Valley Medical, but added that a "few days Prior or possibly a week Prior [Breighonna] had been Setting her hair cut and had bumped her head on the sink" at the hair salon. VRP at 166.
Breighonna died on March 13, 1993. An autopsy, performed by Dr. Michael Dobersen, revealed that Breighonna's death was caused by a bilateral subdural hematoma resulting from a blunt impact.[1] Due to the severe nature of the injuries and the fact that the injuries were inconsistent with Michael's description as to how they occurred, Dobersen classified Breighonna's death as a "homicide." VRP at 340.
The day following Breighonna's death, Michael gave a statement to Detective Mullinax of the King County Police. In his statement he described the incident at the hair salon at which Breighonna allegedly bumped her head on a sink. Michael also told Mullinax how Breighonna had fallen from a swing, but his account varied slightly from what he had previously told the various medical personnel.
*1232 Detective Hatch, of the King County Police, took a statement from Laurinda Jackson on the same day that Mullinax spoke to Michael. Laurinda confirmed Michael's account of how Breighonna had hit her head at the hair salon. In addition, she admitted to spanking Breighonna several times because the child was having trouble with her toilet training. In a later interview with Mullinax, Michael also admitted that "he had once spanked" Breighonna.[2] VRP at 629.
The State subsequently filed an information charging Michael and Laurinda Jackson with second degree felony murder, alleging second degree assault and first degree criminal mistreatment as the predicate felonies.[3] At trial, Drs. Bigler and Newman each testified that Breighonna's injuries were inconsistent with a fall from of a swing. Dr. Roberta Winch, who had also examined Breighonna at Harborview, testified that "[t]he amount of bruising that she [Breighonna] had and the distribution of the bruising was not consistent with the history of falling from a swing." VRP at 217. In addition, Dr. Feldman, a pediatrician with a specialty in injuries related to child abuse, testified after reviewing Breighonna's medical file. He concluded that Breighonna died of a head injury which stemmed from a blunt impact trauma which, he opined, occurred "in the morning" of March 12, 1993. VRP at 973. Moreover, Feldman agreed that a fall from a swing could not have caused Breighonna's injuries.
Ausilene Griswold, testified that she had cut Breighonna's hair at a hair salon on February 26, 1993. Griswold indicated that Breighonna did not hit her head on a sink during the time she was having her hair cut.
Over the objection of both defendants, the trial court gave a jury instruction which stated, in relevant part, that "[u]nless there is a legal duty to act, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice; a legal duty exists for a parent to come to the aid of their small children if physically capable of doing so." Clerk's Papers (CP) at 57 (emphasis added).
The jury found both Michael and Laurinda Jackson guilty of murder in the second degree and indicated, in special interrogatories, that they each committed the crimes of assault in the second degree and criminal mistreatment in the first degree, "which resulted in the death of Breighonna Moore." CP at 76-77, 142-43.
The Jacksons appealed their convictions to Division One of the Court of Appeals. That court reversed the trial court and remanded for a new trial, concluding that the trial court committed reversible error by instructing the jury, in essence, that a parent is an accomplice in the commission of a crime if the parent fails to fulfill his or her "duty" to "aid" their child who is being assaulted or criminally mistreated by another. The Court of Appeals also held that although there was sufficient evidence to support the jury's findings of the predicate felony of second degree assault and that Laurinda was a principal or an accomplice to second degree felony murder, there was insufficient evidence to support its finding of the predicate felony of first degree criminal mistreatment. See Jackson, 87 Wash.App. at 804, 809-19, 944 P.2d 403. The State petitioned for review and we granted it. We also granted Laurinda Jackson's cross-petition for review of the Court of Appeals' determination that there was sufficient evidence to support her conviction for second degree felony murder.

A. STATE'S CONTENTIONS

1. ACCOMPLICE LIABILITY INSTRUCTION
As noted above, the trial court instructed the jury regarding accomplice liability. The instruction, which had been requested by the State, varied significantly from the pattern accomplice liability instruction found in WPIC 10.51. It stated:

*1233 Participant means an accomplice. A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
(1) solicits, commands, encourages, or requests another person to commit the crime or
(2) aids or agrees to aid another person in planning or committing the crime.
The word "aid" means all assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. Unless there is a legal duty to act, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice; a legal duty exists for a parent to come to the aid of their small children if physically capable of doing so.

CP at 57 (modifications to WPIC 10.51 in italics).
The State contends that the trial court did not err in giving this instruction to the jury, arguing that a foster parent who fails to come to the aid of a foster child who is being assaulted or criminally mistreated by another violates his or her duty to protect that child, thereby subjecting them to liability as an accomplice to the assault or criminal mistreatment. The defendants respond that the instruction was erroneous because Washington's accomplice liability statute, RCW 9A.08.020, does not impose liability on an individual for failing to perform a legal duty.
Parents do have a duty to care for and protect their children and the failure of a parent to fulfill that duty may result in civil detriment, such as the termination of parental rights. See In re Welfare of Hudson, 13 Wash.2d 673, 711-12, 126 P.2d 765 (1942). However, even assuming that a foster parent is clothed with the same responsibility and duties as a parent, it is beyond argument that a parent or foster parent's failure to come to the aid of his or her child is not a crime unless the failure falls within the reach of a criminal statute. Because the State has asserted throughout that a parent who fails to aid his or her child who is being assaulted or criminally mistreated is an accomplice to a crime, we must examine this State's accomplice liability statute to determine if a parent's failure to protect his or her child from abuse subjects that person to accomplice liability.
Washington's accomplice liability statute, RCW 9A.08.020, was adopted in 1975 as part of a major revision to the Washington Criminal Code. The portion of the statute pertinent to this case has remained unchanged since its adoption and it provides that:
(3) A person is an accomplice of another person in the commission of a crime if:
(a) With knowledge that it will promote or facilitate the commission of the crime, he
(i) solicits, commands, encourages, or requests such other person to commit it; or
(ii) aids or agrees to aid such other person in planning or committing it; or
(b) His conduct is expressly declared by law to establish his complicity.
RCW 9A.08.020(3). It is readily apparent that this statute does not extend accomplice liability to a person, much less a parent or foster parent, based on the person's failure to fulfill a duty to come to the aid of another. Because such a basis for accomplice liability does not appear in the statute, it follows that the trial court's instruction was a notable expansion on the reach of the statute.
The Legislature's failure to extend liability under our accomplice statute for a parent's failure to act was not, in our judgment, a mere oversight. Indeed, we are satisfied that its decision to limit our accomplice liability statute was a considered decision. We reach that conclusion because RCW 9A.08.020(3) was modeled, in part, on the accomplice liability provision in the Model Penal Code (MPC). See Revised Washington Criminal Code cmt. 1 to proposed RCW 9A.08.060 (later adopted as RCW 9A.08.020), at 44-45 (Legislative Council's Judiciary Comm.1970); MODEL PENAL CODE § 2.06(3) *1234 (1962). The MPC contains a provision, which provides as follows:
(3) A person is an accomplice of another person in the commission of an offense if:
(a) with the purpose of promoting or facilitating the commission of the offense, he
. . . .
(iii) having a legal duty to prevent the commission of the offense, fails to make proper effort so to do.

MODEL PENAL CODE § 2.06(3)(a)(iii) (1962) (emphasis added). It is significant that the Legislature did not include this provision in RCW 9A.08.020(3). A statement of the Legislative Council's Judiciary Committee, which was made while the committee helped draft Washington's Revised Criminal Code, sheds light on why the Legislature chose not to include the language in MPC § 2.06(3)(a)(iii) within the accomplice liability statute. The committee stated that:
(1) as drafted, the language is over-broad and might be held to encompass situations where accessorial liability should, not attach; (2) the rest of the section will cover all situations to which the excluded subdivision was addressed without raising the above-stated objection; and (3) the other jurisdictions examined all excluded this subdivision.
Revised Washington Criminal Code cmt. 1 to proposed RCW 9A.08.060 (later adopted as RCW 9A.08.020), at 44-45 (Legislative Council's Judiciary Comm.1970).
Regardless of the Legislature's reasons, we are bound to conclude that the Legislature's failure to include the language of MPC § 2.06(3)(a)(iii) in Washington's accomplice liability statute was purposeful and evidenced its intent to reject the concept of extending accomplice liability for omissions to act. Significantly, the Legislature has imposed liability in other criminal statutes for omissions to act. For example, it has done so in RCW 9A.42.020, the first degree criminal mistreatment statute, and in RCW 9A.42.030, the second degree criminal mistreatment statute.[4]See State v. Jackson, 87 Wash.App. at 812, 944 P.2d 403. In addition, as the State itself observes in its brief, RCW 26.44.030(1)(c) makes it a crime for an adult who has reasonable cause to believe a child has suffered severe abuse to fail to report such abuse to the authorities. Because in RCW 26.44.030, 9A.42.020, and 9A.42.030 the Legislature has imposed criminal liability for an omission to act, we can presume that it was aware of the concept of omission liability when it adopted the accomplice liability statute. Accordingly, we can only conclude that its failure to include liability for a failure to act in the accomplice liability statute was deliberate. As a consequence, we should refrain from reading omission liability into RCW 9A.08.020. See United Parcel Service v. Department of Revenue, 102 Wash.2d 355, 362, 687 P.2d 186 (1984) (stating that it is an "elementary rule that where the Legislature uses certain statutory language in one instance, and different language in another, there is a difference in legislative intent"); Seeber v. Public Disclosure Comm'n, 96 Wash.2d 135, 139, 634 P.2d 303 (1981). In sum, it is apparent that the Legislature deliberately chose to not include omission liability in the accomplice statute. That being the case, this court should not "read into a statute matters which are not there nor modify a statute by construction." Rhoad v. McLean Trucking Co., 102 Wash.2d 422, 426, 686 P.2d 483 (1984).
*1235 The State has not cited any Washington statute or case that supports the notion that an individual may be liable as an accomplice for a failure to act.[5] Instead, it relies on an argument that because the common law imposes upon parents a duty to protect their children, a "failure to act makes [a parent] an accomplice to the act." State's Pet. for Review at 6. While, as we have indicated, we agree with the State that the common law imposes a duty upon parents to protect children in their custody, we do not agree that a parent's failure to perform this duty subjects them to liability as an accomplice to a crime. As we have observed above, the accomplice liability statute simply does not extend to a failure to come to the aid of another person who is being assaulted or abused. The fact that a common law duty may have been violated does not constitute a crime.[6]See State v. Wissing, 66 Wash.App. 745, 755, 833 P.2d 424 (stating that there are no common law crimes in Washington), review denied, 120 Wash.2d 1017, 844 P.2d 436 (1992).
The State asserts that Washington should follow the lead of other jurisdictions whose statutes expressly include omission liability under their respective accomplice liability statutes.[7] While this may be a sound argument from a policy standpoint, it does not, as we have noted, reflect the current status of the law in Washington. This court should resist the temptation to rewrite an unambiguous statute to suit our notions of what is good public policy, recognizing the principle that "the drafting of a statute is a legislative, not a judicial, function." State v. Enloe, 47 Wash.App. 165, 170, 734 P.2d 520 (1987). The State's public policy argument is better addressed to the Legislature, which may, of course, chose to impose accomplice liability for a defendant's failure to act. If the Legislature does, however, it should do so expressly.
Finally, we consider the dissent's assertion that a "flaw" in our analysis "is that it fails to give appropriate attention to RCW 9A.08.020(3)(b)," which provides that a person is an accomplice of another person in the commission of a crime if "`[h]is conduct is expressly declared by law to establish his complicity.'" Dissenting op. at 1239 (quoting in part RCW 9A.08.020(3)(b)). The dissent points to RCW 9.69.100(1)(c), (4) as the statute expressly establishing the defendants' complicity. That statute provides that it is a misdemeanor for "[a] person who witnesses the actual commission of ... [a]n assault of a child that appears reasonably likely to cause substantial bodily harm to the child" to fail to notify certain public officials as soon as reasonably possible. In our view, it would have been improper for this court to discuss the theory that the dissent advocates. We reach this conclusion because the State did not charge either of the defendants with violating RCW 9.69.100(1)(c), (4), and did not, in its briefing to this court or at oral argument, advance the position the dissent takes.[8] See *1236 John Doe v. Puget Sound Blood Ctr., 117 Wash.2d 772, 785, 819 P.2d 370 (1991) (holding that this "court should not engage in conjectural resolution of issues present, but not briefed").
For the reasons stated above, we conclude that the Court of Appeals was correct in holding that the trial court's accomplice liability jury instruction was erroneous.

2. HARMLESS ERROR
The State contends that any error the trial court made in its jury instruction regarding accomplice liability was harmless. However, as the Court of Appeals correctly noted, the trial court's accomplice liability instruction was problematic because it "excused the jury from the necessity of finding something more than mere presence and knowledge of another's criminal activity in order to convict either defendant as an accomplice." Jackson, 87 Wash.App. at 815, 944 P.2d 403. While it is conceivable that the jury found that one or both of the Jacksons was a principal, rather than an accomplice, we do not know that for certain because the special interrogatory forms that were used by the jury in rendering its verdict do not indicate whether the jury found the defendant guilty as a principal or as an accomplice.
Furthermore, even if the jury had found accomplice liability on the part of one or both of the Jacksons, it is impossible to discern from the interrogatories whether, it was by virtue of their "mere presence and knowledge of the criminal activity," pursuant to the erroneous instruction, or whether it was pursuant to the appropriate statutory standard for accomplice liability. We, therefore, agree with the Court of Appeals that the trial court's instruction constituted reversible error. In the final analysis, the instruction relieved the State of its burden of proving every essential element of guilt beyond a reasonable doubt because it allowed the jury to find the Jacksons, or either of them, guilty as an accomplice to felony murder by virtue of their failure to protect their foster child. The instruction, therefore, is not susceptible to harmless error analysis. See State v. Eastmond, 129 Wash.2d 497, 503, 919 P.2d 577 (1996); State v. Byrd, 125 Wash.2d 707, 713-14, 887 P.2d 396 (1995) ("The State must prove every essential element of a crime beyond a reasonable doubt for a conviction to be upheld. It is reversible error to instruct the jury in a manner that would relieve the State of this burden.") (citations omitted).[9]

3. CRIMINAL MISTREATMENT
The State's final contention is that the Court of Appeals erred in concluding that the evidence was insufficient to support the jury's finding of the predicate felony of first degree criminal mistreatment. The State asserts that there was ample evidence that both of the Jacksons committed the offense of first degree criminal mistreatment by "recklessly ... caus[ing] great bodily harm to [Breighonna] by withholding ... the basic necessities of life" in that they failed to provide her with "shelter."[10] RCW 9A.42.020(1). It contends that the term "shelter," as it is used in the criminal mistreatment statute, encompasses the notion of protection of one's child from an assault, arguing that Michael and Laurinda Jackson's failure to protect Breighonna from the assault constituted the predicate felony of first degree criminal mistreatment.
In holding that there was insufficient evidence that the Jacksons committed the felony of first degree criminal mistreatment, the Court of Appeals viewed the term "shelter" *1237 in a different light, concluding that it meant "housing or protection from the elements," and not protection from an assault. Jackson, 87 Wash.App. at 808, 944 P.2d 403. Because there was no evidence that the Jacksons withheld shelter from Breighonna, it held that the evidence of criminal mistreatment was insufficient and dismissed the felony murder charge against the Jacksons, insofar as it was based on that predicate felony. See Jackson, 87 Wash.App. at 809, 944 P.2d 403.
We are satisfied that the Court of Appeals was correct in concluding that "shelter," as that term is used in RCW 9A.42.010(1), does not encompass the concept of protection of one's child from an assault. As the State concedes, "[i]n construing statutory language, the words must be given their usual, ordinary, commonly accepted and full meaning." State's Pet. for Review at 19 (quoting In re Adoption of Lybbert, 75 Wash.2d 671, 674, 453 P.2d 650 (1969)). In our view, the Court of Appeals properly relied on WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY to determine that the most common meaning of the term "shelter" is "something that affords protection from the elements." Jackson, 87 Wash.App. at 807, 944 P.2d 403 (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2093 (1986)); see State v. Belgarde, 119 Wash.2d 711, 716, 837 P.2d 599 (1992) (holding that "when a statutory term is undefined, dictionaries may be consulted to determine its meaning").
The Court of Appeals' determination as to the meaning of "shelter" is further buttressed by the doctrine of noscitur a sociis. Under this doctrine "the meaning of words may be indicated or controlled by those with which they are associated." Ball v. Stokely Foods, Inc., 37 Wash.2d 79, 87-88, 221 P.2d 832 (1950). Further, under that doctrine "[i]t is ... familiar policy in the construction of terms of a statute to take into consideration the meaning naturally attaching to them from the context, and to adopt the sense of the words which best harmonizes with the context." McDermott v. Kaczmarek, 2 Wash.App. 643, 648, 469 P.2d 191 (1970) (quoting 50 Am.Jur. Statutes § 247 (1944)). We agree with the Court of Appeals that when one looks at the term "shelter" in light of the words surrounding it in RCW 9A.42.010(1) (i.e., "food, water ... clothing, and medically necessary health care") it is clear that the Legislature did not mean for it to encompass the protection of a child from the criminal act of a third person. Rather, it was referring to a parent's duty to take affirmative acts to provide the basic necessities of life for his or her children.
Finally, even if we assume that the term "shelter" is ambiguous in that it is susceptible to more than one interpretation, we are required under the rule of lenity to adopt the interpretation most favorable to the defendant. See State v. Roberts, 117 Wash.2d 576, 586, 817 P.2d 855 (1991); State v. Dunn, 82 Wash.App. 122, 128, 916 P.2d 952, review denied, 130 Wash.2d 1018, 928 P.2d 413 (1996). Accordingly, for the reasons stated above, we reject the State's contention that "shelter," as found in RCW 9A.42.010, encompasses the notion of protection of a person from the criminal act of a third person.

B. LAURINDA'S CONTENTION
Laurinda asserts that there was insufficient evidence introduced at trial to support her conviction as either a principal or an accomplice to the second degree assault, the predicate felony of second degree felony murder. Accordingly, she argues that her "conviction for second degree felony murder should be reversed and dismissed." Br. of Appellant at 16.
The test that this court must apply to determine the validity of a claim of insufficiency of evidence is:
[W]hether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.
State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992) (citation omitted); State v. Green, 94 Wash.2d 216, 221-22, 616 P.2d 628 (1980).
*1238 Laurinda's contention as to the insufficiency of the evidence is based on her view that the "evidence at trial established that the fatal assault causing Breighonna's death occurred between 7:00 a.m. and noon on Friday, March 12, 1993" and that she was at work on that day between 7:00 a.m. and noon. Br. of Appellant at 16-17. That being the case, she asserts "it is impossible for [her] to have committed the assault ... which caused Breighonna's death." Br. of Appellant at 17-18. Contrary to Laurinda's contention, the medical evidence introduced at trial did not conclusively establish the precise time at which Breighonna suffered the injuries that led to her death. Dr. Feldman, as previously noted, merely testified that Breighonna suffered the fatal injury "[s]ometime ... in the morning" of March 12, 1993. VRP at 973. There is, therefore, a factual issue about whether Laurinda was present when the injuries were inflicted on Breighonna. Accordingly, a jury could conclude that Laurinda inflicted these injuries on the child herself. Such a conclusion would not be irrational, particularly in light of the concession in Laurinda's brief to the Court of Appeals that "the prior injuries sustained by Breighonna were sufficient to constitute substantial bodily harm under the Assault in the Second Degree statute ... [and] that Ms. Jackson could be connected to the assault(s) that presumably caused the prior injuries either as a principal or accomplice." Br. of Appellant at 19-20 (footnote and citation omitted).
Moreover, this court has expressly held that an accomplice "need not be physically present at the commission of the crime ... [if the accomplice] did something in association with the principal to accomplish the crime." State v. Boast, 87 Wash.2d 447, 455-56, 553 P.2d 1322 (1976). We are satisfied that based on the evidence we have reviewed, a jury could reasonably find that Laurinda was Michael's accomplice to the assault on Breighonna regardless of whether Laurinda was present when the fatal injuries were inflicted.
In short, after viewing the evidence in the light most favorable to the State, we are satisfied that a rational juror could find that Breighonna's death was a natural and probable consequence of an assault by Laurinda or by her actions as an accomplice to Michael Jackson. Accordingly, the Court of Appeals did not err in concluding that there was sufficient evidence to convict Laurinda of second degree felony murder with assault in the second degree as the predicate felony.

CONCLUSION
For the reasons we have set forth above, we conclude that the record in this case supports reversal of both defendants' convictions for the reason that the trial court gave an erroneous accomplice liability instruction to the jury. We further conclude that there was insufficient evidence to support the criminal mistreatment alternative for the felony murder charge as to both defendants. Finally, we conclude that there is sufficient evidence to support a conviction of Laurinda Jackson for felony murder in the second degree, with assault in the second degree as the predicate felony. Accordingly, we affirm the decision of the Court of Appeals, and remand for a new trial based only upon the assault alternative for second degree felony murder.
Affirm the Court of Appeals.
GUY, C.J., and SMITH, JOHNSON, MADSEN, SANDERS, JJ., and DOLLIVER, J.P.T., concur.
TALMADGE, J. (dissenting).
This heinous case of child abuse by foster parents, Michael and Laurinda Jackson, resulted in the death of their two-year-old foster daughter, Breighonna. The majority erroneously analyzes accomplice liability under Washington law and ignores long-standing principles of Washington law obligating parents or persons standing in loco parentis to come to the aid of their children. I would hold the trial court properly instructed the jury on the question of accomplice liability and affirm the defendants' convictions for felony murder in the second degree.
The trial court's instruction here noted a parent has a legal duty to come to the aid of their small children if the child is being abused. The trial court's instruction stated:

*1239 Participant means an accomplice. A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
(1) solicits, commands, encourages, or requests another person to commit the crime or
(2) aids or agrees to aid another person in planning or committing the crime.
The word "aid" means all assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. Unless there is a legal duty to act, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice; a legal duty exists for a parent to come to the aid of their small children if physically capable of doing so.
Jacksons' Clerk's Papers at 57.
The majority concludes Washington's accomplice liability statute, RCW 9A.08.020, does not provide for accomplice liability if a person fails to perform a legal duty. The majority finds this is true because RCW 9A.08.020(3)(a) provides a person is an accomplice in the commission of a crime if: "(a) [w]ith knowledge that it will promote or facilitate the commission of the crime, he (i) solicits, commands, encourages, or requests such other person to commit it; or (ii) aids or agrees to aid such other person in planning or committing it." The majority notes this statutory provision is based on the Model Penal Code (MPC) section 2.06(3). Washington's accomplice statute, however, specifically omits MPC 2.06(3)(a)(iii) which states additionally: "having a legal duty to prevent the commission of the offense, fails to make proper effort to do so." From this omission, the majority concludes the 1975 Legislature specifically rejected the possibility that accomplice liability could be predicated upon the failure to act.
The flaw in the majority's analysis is that it fails to give appropriate attention to RCW 9A.08.020(3)(b). The Legislature provided a person is an accomplice of another person in the commission of a cime if "[h]is conduct is expressly declared by law to establish his complicity." RCW 9A.08.020(3)(b). This provision appears at MPC section 2.06(3)(b). The Legislature's enactment of this additional section explains the statement referenced in the majority opinion by the Legislative Council's Judiciary Committee that "the rest of the section will cover all situations to which the excluded subdivision was addressed without raising the above-stated objection." Majority op. at 1234. This statement comports with comment 6(e) to Model Penal Code § 2.06, at 320 (1985): "Subsection 3(b) preserves all special legislation declaring that particular behavior suffices for complicity, whether or not it would suffice under the standards of Subsection (3)(a)." Thus, in 1975, the Legislature expressly contemplated a person could be an accomplice if the person's conduct was expressly declared by law to establish that person's complicity in the crime.
Under Washington statutory law, a "person who witnesses the actual commission of... [a]n assault of a child that appears reasonably likely to cause substantial bodily harm to the child, shall as soon as reasonably possible notify the prosecuting attorney, law enforcement, medical assistance, or other public officials.... Failure to report as required... is a gross misdemeanor." RCW 9.69.100(1)(c) and (4).[1] If Laurinda watched Michael and Michael watched Laurinda perpetrate incessant brutality on a helpless baby, and neither reported it, they were guilty of a gross misdemeanor. But more important for this case, were they also not each complicit in these monstrous crimes? Can one be anything but guilty complicit when one observes such atrocities and fails to intervene or seek help? Our accomplice liability statute, expressly in the words of section 3(b), expressly in the commentary of the Legislative Council's Judicial Committee, and expressly in the commentary of the Model Penal Code, captures statutes like RCW 9.69.100 within its ambit.
*1240 Moreover, both the common law and administrative law expressly establish a parent's complicity in the conduct of another abusive parent. Under Washington common law, both parents have a duty to care for and protect their children and the failure of a parent to fulfill that duty may result in the imposition of criminal culpability or the termination of parental rights. See, e.g., In re Welfare of Hudson, 13 Wash.2d 673, 711-12, 126 P.2d 765 (1942). See also State v. Morgan, 86 Wash.App. 74, 936 P.2d 20, review denied, 133 Wash.2d 1011, 946 P.2d 401 (1997); State v. Williams, 4 Wash.App. 908, 915, 484 P.2d 1167 (1971); In re Adoption of Potter, 85 Wash. 617, 620, 149 P. 23 (1915). In Williams, the Court of Appeals described the common law duty as "natural duty existing independently of statutes" and further stated "[w]e therefore hold that the violation of the parental duty to furnish medical care to a minor dependent child, the other elements of manslaughter being present, is a sufficient basis on which to rest a conviction of the crime of manslaughter...." Williams, 4 Wash.App. at 915, 484 P.2d 1167. As foster parents, the Jacksons agreed to abide by Washington Administrative Code provisions relating to foster parents. They promised in writing to "not use any type of physical discipline." Ex. 41(c). They promised in writing to report any abuse, as is consistent with statutes obligating them to report child abuse to law enforcement or the Department of Social and Health Services. See Exs. 41(c), 65; RCW 26.44.030(1). Finally, and most pointedly, applicable administrative law prohibited their use of corporal punishment and affirmatively required them to "protect persons, while in the licensee's care, from child abuse or neglect." WAC 388-73-048(1), 388-73-050.
The majority's analysis of the accomplice liability statute reads section 3(b) out of the statute. The Legislature plainly meant something by its enactment of RCW 9A.08.020(3)(b). If the law expressly declares certain conduct establishes a person's complicity in the crime, the person is guilty as an accomplice. Given the statutory requirement to report an assault on a child, the administrative law provisions governing the relationship of the Jacksons to Breighonna as foster parents, and the general common-law duty of parents and those in loco parentis to safeguard the interests of children, the complicity required by section 3(b) is present here; the trial court properly instructed the jury on accomplice liability in this case.
The cruel death inflicted by two foster parents on a two-year-old girl, a child who had already seen enough trouble in her all too brief life, was a tragedy. The jury properly convicted two people who should have loved this little girl but instead killed her. Washington law and the Jacksons' specific contractual duty obliged them to render appropriate assistance to a child who was subject to abuse or neglect. Washington law plainly contemplates and expressly declares the establishment of the Jacksons' complicity. The trial court's instruction on accomplice liability in this case was proper. I would reverse the Court of Appeals and reinstate the convictions of the Jacksons for felony murder in the second degree.
DURHAM, J., concurs.
NOTES
[1] Dr. Dobersen listed all of the injuries he observed on Breighonna's body. These included: a bilateral subdural hematoma, a vaginal injury, a bruise near the right eye, bruises on both ears, lacerations and abrasions inside her mouth, bruises on her buttocks, bruises on both arms, a bruise on the left side of her crotch, a bruise on the lower quadrant of her abdomen, hemorrhages on both arms, several hemorrhages on her scalp, and a hemorrhage on her left thigh.
[2] This interview occurred in Jacksonville, Florida, on March 24, following the Jacksons' arrest in that city.
[3] Michael was also charged with rape of a child in the first degree. This charge was based on the abrasion on Breighonna's vagina that Drs. Bigler and Dobersen discovered. The jury found Michael not guilty on that charge.
[4] RCW 9A.42.020(1), in relevant part, provides that:

"parent of a child, the person entrusted with the physical custody of a child or dependent person, or a person employed to provide to the child or dependent person the basic necessities of life is guilty of criminal mistreatment in the first degree if he or she recklessly ... causes great bodily harm to a child or dependent person by withholding any of the basic necessities of life."
RCW 9A.42.030(1), in relevant part, provides that:
"parent of a child, the person entrusted with the physical custody of a child or dependent person, or a person employed to provide to the child or dependent person the basic necessities of life is guilty of criminal mistreatment in the second degree if he or she recklessly ... either (a) creates an imminent and substantial risk of death or great bodily harm, or (b) causes substantial bodily harm by withholding any of the basic necessities of life."
[5] The State does rely on a provision in Washington's Administrative Code (WAC) XXX-XX-XXX, which provides that foster parents "shall protect persons, while in the licensee's care, from child abuse or neglect." The failure to abide by this administrative regulation is not, however, a crime. An administrative agency has no greater authority than that it is given by statute. See Washington Water Power Co. v. Washington State Human Rights Comm'n, 91 Wash.2d 62, 65, 586 P.2d 1149 (1978) ("An administrative agency is limited in its powers and authority to those which have been specifically granted by the legislature."). Because the Legislature has not made it a crime to violate the cited regulation, or vested DSHS with the power to impose criminal liability, the State's reliance on WAC 388-73-050 is misplaced. See RCW 74.15.030.
[6] The State cites RCW 9A.04.060, which provides:

"The provisions of the common law relating to the commission of crime and the punishment thereof, insofar as not inconsistent with the Constitution and statutes of this state, shall supplement all penal statutes of this state...." (Emphasis added). Because Washington's accomplice liability statute does not include liability for a failure to act, it is inconsistent with the common law. The statute, therefore, prevails over the common law pursuant to RCW 9A.04.060.
[7] See, e.g., HAW.REV.STATE. § 702-222(1)(c) (1997); N.J. STAT. ANN. § 2C:2-6(c)(1)(c) (West 1997); OR.REV.STAT. § 161.155(2)(c) (1997).
[8] At oral argument before this court, the dissenting justice pressed the State's counsel about the relevance of RCW 9A.08.020(3)(b). It was evident from the response of the State's counsel that the State had not given any consideration to the possible impact of that statute to this case. See oral argument tape (Sept. 22, 1998).
[9] Laurinda also contends that the accomplice liability instruction violated the prohibition against ex post facto legislation as well as her right to equal protection. She also argues that the "prosecution's tactical delay in divulging its novel `duty to protect' theory" violated her right to counsel. Laurinda Jackson's Answer and Cross-Pet. at 12. Because we conclude that the accomplice liability instruction was erroneous and not harmless error, we need not address these issues.
[10] RCW 9A.42.010(1) defines the "basic necessities of life" as "food, water, shelter, clothing, and medically necessary health care, including but not limited to health-related treatment or activities, hygiene, oxygen, and medication." (Emphasis added).
[1] The general duty to render aid to a victim of felony-level conduct is a significant public policy in Washington. Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 913 P.2d 377 (1996).