

FILED
COURT OF APPEALS
STATE OF WASHINGTON

2015 JUN -8    9: 21

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71342-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DERRON PATRICK ALEXIS, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 8, 2015 |

SCHINDLER, J. — The jury convicted Derron Patrick Alexis of unlawful imprisonment and criminal mistreatment in the first degree of N.A. By special verdict, the jury found N.A. was particularly vulnerable and Alexis used his position of trust to facilitate commission of the crimes. Alexis contends insufficient evidence supports the unlawful imprisonment conviction and the court did not properly instruct the jury on accomplice liability. Alexis also claims the court erroneously imposed an exceptional sentence and insufficient evidence supports the finding that N.A. was particularly vulnerable. We affirm.

FACTS

In November 2008, Genevieve Alexis adopted eight-year-old N.A. and her two younger brothers. The elementary school in New York placed N.A. in a special education program. Genevieve disagreed with the placement and in August 2010, sent N.A. to live in Washington with her adult son Derron Patrick Alexis.[1]

Alexis lived with Mary Mazalic in Mukilteo. Alexis and Mazalic had been together for over 15 years. Mazalic had a number of physical and mental health conditions, including epilepsy, osteoarthritis, diabetes, multiple sclerosis, and bipolar disorder. The side effects of Mazalic's epilepsy medication affected her ability "to stay awake." Alexis was paid by the State to act as Mazalic's caregiver, including cooking meals, helping her bathe and dress, and taking her to doctor's appointments.

Alexis worked as an airplane mechanic four days a week during the night shift. On his days off, Alexis frequently worked out at a gym and trained in mixed martial arts.

Alexis shared responsibility with Mazalic for taking care of N.A. At first, N.A. enjoyed living with Alexis and Mazalic, "[i]t was really good and nice." But beginning the "[m]iddle" of the school year, Alexis and Mazalic began beating and torturing N.A.

N.A. was confined to her room for up to three or four days at a time and was not allowed to eat. Mazalic often handcuffed N.A. to a couch during the day while Mazalic slept. N.A. was kept isolated from the other neighborhood children. Mazalic told neighbors that N.A. was "a monster" who would hurt their children or steal from them.

---

[1] Because Genevieve Alexis and Derron Patrick Alexis share the same last name, we refer to Genevieve Alexis by her first name and Derron Patrick Alexis by his last name.

2

Alexis and Mazalic withheld food from N.A. At mealtimes, Alexis and Mazalic would eat food in front of N.A. but would not allow her to eat. N.A. did not sneak food from the kitchen cupboards because she was afraid Alexis or Mazalic would hear and she would be punished. N.A. sometimes surreptitiously ate the dog's food.

Mazalic and Alexis physically abused N.A. Mazalic would gag N.A. with a sock or a ball and hit N.A. with a belt, a wire, and extension cords. Mazalic also burned N.A. on the wrist and ankle with cigarettes. Alexis hit N.A. with a wire and with a black belt "[a] lot." When Alexis beat N.A., Mazalic watched.

In August 2011, Mazalic took N.A. with her to a clothing store. Two clothing store employees said N.A. appeared "emaciated," was "trembling," and had a deep open gash on her wrist. One of the employees testified that she "knew something was wrong by [N.A.'s] appearance" because her "bones were protruding" and "[h]er cheeks were sunken in. . . . She just looked way too thin for a child." Using the name on Mazalic's credit card receipt, the employees called Child Protective Services (CPS).

Prior to taking N.A. into protective custody, Mukilteo Police Department Corporal Gary Marienau interviewed Alexis. Alexis told Corporal Marienau that Mazalic was his significant other and that he and Mazalic planned to adopt N.A. When asked about the marks on N.A.'s body, Alexis claimed they were from "plants and bushes in the back of the residence."

Medical professionals examined N.A. and diagnosed her with severe malnutrition and a kidney infection. N.A. had abrasions, bruising, and scarring consistent with cigarette burns and high-velocity whipping with a looped cord and a belt buckle. N.A.

3

had no subcutaneous fat and had prominent muscle wasting, low body temperature, pancreatic and liver inflammation, and a distended abdomen. The forensic nurse who examined N.A. testified that in 12 years of practice, she had never seen a child as malnourished as N.A.

Snohomish County Sheriff's Office Detective Tyler Quick recorded the interview with Alexis. Alexis told Detective Quick that he and Mazalic shared responsibility for taking care of N.A. Alexis stated that he was close to N.A., that N.A. called him "dad," and that "he would know" if N.A. had any medical problems. Alexis said N.A. received plenty of food and "didn't miss any meals." Alexis described the large meals that N.A. would eat and said they took her "to all-you-can-eats where she would eat herself sick to where her belly swelled up." Alexis said he worked four days a week on swing shift but he had Wednesdays, Thursdays, and Fridays off and "always" made sure N.A. was fed. Alexis denied he had ever "raised a hand" to N.A. When asked if Mazalic ever hit N.A., Alexis said, "Absolutely not."

The State charged Alexis with criminal mistreatment in the first degree and unlawful imprisonment.[2] The State also alleged as aggravating factors that Alexis knew or should have known that N.A. was particularly vulnerable or incapable of resistance under RCW 9.94A.535(3)(b) and that he used his position of trust or confidence to facilitate the commission of the offenses under RCW 9.94A.535(3)(n).

---

[2] The State also charged Mazalic. In a separate trial, the jury convicted her of criminal mistreatment in the first degree, assault of a child in the first degree, and tampering with a witness.

Before trial, the court granted the defense motion to exclude some of the evidence of Mazalic's conduct against N.A.[3] but ruled the following evidence was admissible:

1. Burning N.A. with cigarettes
2. Hitting N.A. with extension cords
3. Hitting N.A. with her clothes off
4. Hitting N.A. with a black belt
5. Hitting N.A. with "a stiff wire with red things on the end."
6. Making N.A. go without food
7. Eating meals in front of N.A. when she could not eat
8. Beating N.A. in various areas of the home
9. Making N.A. wear diapers . . .
10. Making N.A. sleep in a tent in the backyard
11. Making N.A. . . . eat "jail food"
12. Listening in on N.A.'s phone conversations with Genevieve Alexis
13. Beating N.A. until she needed a break, then would beat N.A. again
14. Putting a squeeze ball into N.A.'s mouth to stifle her screams.

Twenty-nine witnesses testified during the five-day jury trial. Detective Quick's interview with Alexis was admitted and played for the jury.

Pediatrician and child abuse expert Dr. Kenneth Feldman testified N.A. had "a lot of sores on her skin . . . , some of which are circular, small ulcerations or scars," and "a lot of pigmentary change where she is darker than normal because of previous skin

---

[3] The court ruled the following evidence was excluded:
1. Threats to kill N.A. and dump her body
2. Attempts to drown N.A. in a bathtub
3. The application of ice on N.A.'s wounds
4. Making N.A. put a pee-filled diaper on her head
5. Making N.A. take cold showers
6. Putting soap in N.A.'s food
7. Making N.A. gargle with dish soap and shampoo
8. Making N.A. sleep in a bathtub
9. Making N.A. stay in a bathroom
10. Cutting N.A.'s hair
11. Whether Mazalic wanted N.A.'s scars to show
12. Telling N.A. [Mazalic] had done similar things to [N.A.'s adopted brother].

5

injury." Dr. Feldman identified a "loop-type" whipping mark on the left side of N.A.'s chest.

> Here you can see much more formed examples of whipping a child with a looped cord. One of the characteristics of the whipping with a cord is that the blood vessels under it are compressed. The blood is pushed out from under the injuring object. There is also a sheer plane at the edge of the injuring object.
> So often with those high velocity impacts, we will get this railroad track appearance where the actual impact site under the cord looks pretty normal, but outlining either side of it is a row of broken blood vessels causing what we call petechiae or little capillary bursts of blood vessels within the skin.

Dr. Feldman identified other whipping marks on N.A.'s right chest and left thigh and testified the marks had "somewhat of a pinker hue suggesting they are fairly acute." Dr. Feldman testified N.A. had an E. coli bacteria infection and, if untreated, the kidney infection was potentially fatal, particularly in N.A.'s weakened condition.

N.A. testified. During her testimony, the prosecutor asked N.A. about statements she had previously made to CPS investigator Jennifer Brady. N.A. admitted telling Brady that Alexis hit her "[a] lot" with the belt and wire on her chest and side. N.A. also said that she told Brady that Alexis refused to give her food. N.A. testified that when Genevieve visited her in the hospital, Genevieve told her not to "say anything, and if they ask you questions, lie about it." N.A. testified that after Mazalic left her locked in a dog crate, Alexis came into the room with a belt in his hand and did not let her out.

Brady testified that N.A. was initially unwilling to talk to her because the "family could get in trouble" and N.A. said, "They are all I have." N.A. told Brady someone had told her that "if I talk to you, my brothers will be taken away and separated." Brady testified N.A. eventually "told me that [Alexis] hit her with a belt and a cord many times, and that he had also given her the bad oatmeal, which was not cooked."

6

Alexis testified. He denied the charges of criminal mistreatment and unlawful imprisonment. Alexis said there was "only one time" that N.A. did not eat and that was because she had the flu and "wasn't hungry." Alexis testified he and Mazalic did not have a dog crate and denied N.A. was ever locked in a dog crate.

The court instructed the jury. The jury convicted Alexis as charged and returned special verdicts as to the aggravating factors on both counts. The court imposed an exceptional sentence by ordering the sentences to be served consecutively.

## ANALYSIS

### Sufficiency of the Evidence

Alexis contends insufficient evidence supports the conviction for unlawful imprisonment. Sufficient evidence supports a conviction if, when viewed in the light most favorable to the State, any rational trier of fact would find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201. On review, we need not be convinced of the defendant's guilt beyond a reasonable doubt but only that substantial evidence supports the State's case. State v. Fiser, 99 Wn. App. 714, 718, 995 P.2d 107 (2000). We defer to the trier of fact on "issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." Fiser, 99 Wn. App. at 719; State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

A person is guilty of unlawful imprisonment if he or she knowingly restrains another person. RCW 9A.40.040(1). "Restrain" means "to restrict a person's movements without consent and without legal authority in a manner which interferes

7

substantially with his or her liberty." RCW 9A.40.010(6). Restraint is "without consent" if it is accomplished by physical force, intimidation, or deception. RCW 9A.40.010(6)(a).

An individual is an accomplice when he aids another person in committing a crime with knowledge that his actions will promote or facilitate the commission of the crime. RCW 9A.08.020(3). An accomplice need not participate in or have specific knowledge of every element of the crime nor share the same mental state as the principal. State v. Sweet, 138 Wn.2d 466, 479, 980 P.2d 1223 (1999).

Relying on State v. Jackson, 137 Wn.2d 712, 976 P.2d 1229 (1999), Alexis argues that accomplice liability does not extend to his mere presence or failure to act. Alexis's reliance on Jackson is misplaced.

In Jackson, a husband and wife were convicted of second degree felony murder of their foster child. Jackson, 137 Wn.2d at 715. The trial court instructed the jury that either defendant could be an accomplice to the murder if he or she failed to come to the aid of the child. Jackson, 137 Wn.2d at 720-21. The instruction was improper because a parent's failure to protect his or her child from abuse, without more, is not a basis for accomplice liability. Jackson, 137 Wn.2d at 722-24.

Here, unlike Jackson, the court correctly instructed the jury that accomplice liability required more than Alexis's mere presence and knowledge of the criminal activity and the evidence establishes Alexis did more than simply fail to come to the aid of N.A.

N.A. testified that after Mazalic locked N.A. in the metal dog crate and left, "I was making some noise in the crate, and [Alexis] heard me, probably was thinking that I was getting out, and came downstairs with a belt." Alexis denied that he and Mazalic had a

8

dog crate in the house and that the event occurred. But a witness who was at the house "quite a bit" testified Alexis and Mazalic had a large wire dog crate "[b]ig enough for a child of [N.A.]'s size to fit in." And another witness and friend of Alexis and Mazalic's also testified they had a dog crate in the house.

Viewing the evidence in the light most favorable to the State, the evidence shows Alexis slept during the day and did not like to be disturbed, and he physically abused N.A. during the year that she lived with him. The evidence shows Alexis frequently hit N.A. with a wire and a belt. N.A.'s body had bruising and marks consistent with being hit with a belt. The jury could reasonably infer that Alexis promoted or facilitated the crime of unlawful imprisonment. When Alexis heard N.A. making noise while locked in the dog crate, he came into the room with a belt in his hand that he had previously used to beat her. The jury could conclude Alexis intimidated N.A. to stop making noise and remain in the locked dog crate. Sufficient evidence supports the conviction of unlawful imprisonment.

<u>Accomplice Liability Instruction</u>

Alexis argues the jury instructions improperly relieved the State of the burden of proving accomplice liability beyond a reasonable doubt.

We review a challenge to a jury instruction de novo, evaluating the jury instruction "in the context of the instructions as a whole." <u>State v. Bennett</u>, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). " 'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.' " <u>Keller v. City of Spokane</u>, 146

No. 71342-6-I/10

Wn.2d 237, 249, 44 P.3d 845 (2002) (quoting <u>Bodin v. City of Stanwood</u>, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)).

Here, Jury Instruction No. 3 informed the jury that the State bore the burden of "proving each element of each crime beyond a reasonable doubt." The "to convict" instruction for unlawful imprisonment, Jury Instruction No. 9, accurately states the elements of the crime and the burden of proof.[4] Jury Instruction No. 10 defines when a person acts with knowledge:

> A person knows or acts knowingly or with knowledge with respect to a fact, circumstance or result when he or she is aware of that fact, circumstance or result. It is not necessary that the person know that the fact, circumstance or result is defined by law as being unlawful or an element of a crime.
> If a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact.
> When acting knowingly as to a particular fact is required to establish an element of a crime, the element is also established if a person acts intentionally as to that fact.

---

[4] Jury Instruction No. 9 states:

> To convict the defendant of the crime of unlawful imprisonment as alleged in Count 2, each of the following five elements of the crime must be proved beyond a reasonable doubt:
> (1) That during the time period beginning on or about the 7th day of September, 2010 and concluding on or about the 15th day of August, 2011 the defendant restrained the movements of N.A. in a manner that substantially interfered with her liberty;
> (2) That such restraint was without N.A.'s consent; and
> (3) That such restraint was without legal authority;
> (4) That, with regard to elements (1), (2), and (3), the defendant acted knowingly; and
> (5) That any of these acts occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

10

Jury Instruction No. 4 is based on 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 10.51, at 217 (3d ed. 2008), and accurately defines "accomplice liability." Jury Instruction No. 4 states:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.
>
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he either:
>
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
>
> (2) aids or agrees to aid another person in planning or committing the crime.
>
> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.
>
> A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

Alexis argues that because the accomplice liability instruction "was completely silent as to the State's burden of proof" and the to-convict instruction did not incorporate accomplice liability language, the jury instructions improperly relieved the State of its burden of proving accomplice liability beyond a reasonable doubt. We considered and rejected the same argument in State v. Teal, 117 Wn. App. 831, 73 P.3d 402 (2003).

In Teal, although the accomplice liability instruction did not refer to the reasonable doubt standard and the to-convict instruction did not incorporate accomplice liability language, we concluded that as a whole, the jury instructions satisfied due process and did not relieve the State of its burden of proof. Teal, 117 Wn. App. at 839-

11

40. Here, as in Teal, the jury instructions considered as a whole correctly informed the jury of the State's burden of proof.

Aggravating Factor

The jury returned special verdicts on the charged aggravating factors. The jury found that Alexis knew or should have known N.A. was "particularly vulnerable or incapable of resistance" and used his position of trust or confidence to facilitate the commission of the crimes. Alexis challenges the factual basis for finding the State proved the aggravating factor that N.A. was a particularly vulnerable victim.

To prove a victim's vulnerability as an aggravating factor, the State must establish the defendant knew or should have known of the victim's particular vulnerability and vulnerability was a substantial factor in the commission of the crime. State v. Suleiman, 158 Wn.2d 280, 291-92, 143 P.3d 795 (2006). An "evident disparity in size and strength" between a defendant and victim may establish that a victim was particularly vulnerable, particularly in cases involving physical assault. State v. Olive, 47 Wn. App. 147, 153, 734 P.2d 36 (1987); State v. Holyoak, 49 Wn. App. 691, 695, 745 P.2d 515 (1987). Other relevant considerations include whether the defendant "perpetuated the abuse by psychological means designed to keep the victim within the cycle of abuse." State v. Brown, 55 Wn. App. 738, 753-54, 780 P.2d 880 (1989). We review whether the record supports the special verdict on an aggravating factor under the clearly erroneous standard. State v. Fowler, 145 Wn.2d 400, 405, 38 P.3d 335 (2002).

Alexis argues the evidence did not show N.A. was particularly vulnerable or that her vulnerability was a substantial factor in the commission of the crimes. We disagree.

As in Olive and Holyoak, there was an overwhelming disparity in age, size, and strength between Alexis and N.A.

Alexis was 44-years-old, weighed 285 pounds, frequently worked out at a gym, and trained as a mixed martial arts fighter. At the time N.A. was taken into protective custody, she was 10-years-old, weighed only 51 pounds, was emaciated, and was suffering from a serious kidney infection. The jury's special verdict was supported by the record and was not clearly erroneous.

Exceptional Sentence

Alexis argues that the court improperly relied on facts not found by the jury in imposing an exceptional sentence. The record does not support Alexis's claim.

A criminal defendant has a constitutional right to have a jury determine any fact that increases the penalty for a crime beyond the prescribed statutory maximum. Blakely v. Washington, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Before imposition of an exceptional sentence, a jury must first determine by special verdict whether the State has proved the aggravating circumstances beyond a reasonable doubt. RCW 9.94A.537(3); Blakely, 542 U.S. at 301. If the jury returns a special verdict on the aggravating circumstances, a court may sentence the offender up to the maximum term allowed for the underlying conviction if it finds the facts alleged and found were sufficiently substantial and compelling to warrant an exceptional sentence. RCW 9.94A.537(6). Whenever the court imposes a sentence outside the standard range, it "shall set forth the reasons for its decision in written findings of fact and conclusions of law." RCW 9.94A.535.

Here, the court entered written findings of fact and conclusions of law in support of the exceptional sentence. The findings state:

> The defendant was responsible for Mary Mazalic as her caregiver and was responsible for N.A. The defendant was N.A.'s adoptive brother. She was sent to his home. She was particularly vulnerable and the defendant knew it. The defendant was not merely a person with his "head in the sand." He acted alone and as an accomplice, causing N.A.'s severely starved, emaciated condition. Based on the jury's finding that N.A. was a particularly vulnerable victim, and that he abused a position of trust which facilitated the commission of these crimes, the court finds substantial [and] compelling reasons to impose an exceptional sentence.

The court's findings that Alexis was responsible for N.A. and knew of N.A.'s particular vulnerability reiterates the jury finding Alexis abused a position of trust and N.A. was particularly vulnerable. The other facts recited in the court's findings—Alexis "was not merely a person with his 'head in the sand' " and he "caus[ed] N.A.'s severely starved, emaciated condition"—were permissible considerations in determining the length of Alexis's sentence.

Alexis also contends the court erred by imposing an exceptional sentence based on the aggravating factor of abuse of a position of trust for the criminal mistreatment conviction because abuse of a position of trust is inherent in the offense.[5] See State v. Ferguson, 142 Wn.2d 631, 647-48, 15 P.3d 1271 (2001) (a factor inherent in the offense cannot be used as an aggravating factor). The State concedes abuse of a position of trust is inherent in the offense of criminal mistreatment in the first degree but argues remand is not necessary. We agree remand is not necessary.

---

[5] A person is guilty of criminal mistreatment in the first degree if they are "entrusted with the physical custody of a child" and they recklessly cause great bodily harm to that child "by withholding any of the basic necessities of life." RCW 9A.42.020(1).

14

We may uphold an exceptional sentence when the court would have imposed the same sentence based upon other valid factors. State v. Jackson, 150 Wn.2d 251, 276, 76 P.3d 217 (2003). The written conclusions of law expressly state that the court would "impose the same exceptional sentence based on each aggravating factor independent of the other." We affirm the imposition of an exceptional sentence based on the vulnerable victim aggravating factor.

We affirm the jury conviction of unlawful imprisonment and criminal mistreatment in the first degree and imposition of the exceptional sentence.

WE CONCUR:

Trickey, J

Becker, J.