237 P.3d 282 (2010)
STATE of Washington, Respondent,
v.
Marilea R. MITCHELL, Petitioner.
No. 83169-6.
Supreme Court of Washington, En Banc.
Argued June 29, 2010.
Decided August 12, 2010.
*283 Sarah McNeel Hrobsky, Washington Appellate Project, Seattle, WA, for Petitioner.
Seth Aaron Fine, Mary Kathleen Webber, Snohomish County Prosecutor's Office, Everett, WA, for Respondent.
SANDERS, J.
¶ 1 The State charged Marilea R. Mitchell with first degree criminal mistreatment after deputies discovered a severely malnourished four-year-old boy in her care. The State's amended information alleged that Mitchell, "a person who has assumed the responsibility to provide to a dependent person the basic necessities of life," recklessly caused great bodily harm to a "child or dependent person" by withholding those basic necessities of life. Clerk's Papers (CP) at 26. Mitchell now claims insufficient evidence supports her conviction because the terms "child" and "dependent person" are mutually exclusive in the criminal mistreatment statute, RCW 9A.42.020(1). She contends insufficient evidence exists to show she harmed a dependent person. We disagree. Mitchell's conviction is proper.

FACTS
¶ 2 The child in this case, S.A., was born in October 2002. For several years S.A. lived intermittently with his biological mother or with a foster family. When S.A. turned three, he returned to his biological father, Danny Abegg, who was Mitchell's boyfriend. While S.A. was not Mitchell's biological child, she shared responsibility for the boy's care, most notably when Abegg left for work. S.A. weighed about 38 pounds when Abegg took custody of him in late 2005.
¶ 3 About a year later, near Christmastime 2006, Mitchell's sister, Marie, visited the couple's house. Upon seeing S.A.'s thinness, she told Abegg and Mitchell she was worried about the boy's health and tried to convince them to schedule a doctor's appointment. The couple responded that they were trying to get some type of state medical coupon for a subsidized doctor's visit. Marie revisited the house on March 6, 2007. The day after that second visit, Marie called Child Protective Services because S.A. seemed sick and starved.
¶ 4 On March 7, 2007, Snohomish County sheriff's deputies rang the couple's doorbell to perform a welfare check. Abegg answered the door. After listening to the deputies, Abegg headed for S.A.'s bedroom, where he attempted to shut the door so the deputies would not see him put a T-shirt on S.A. Once in the bedroom, the deputies found S.A. lying in a bed soaked with urine. S.A. could not sit up in bed without his father's assistance. When Abegg picked S.A. up from the bed and tried to stand S.A. on his feet, the boy could not stand. He was shaking violently. Asked what he ate that day, S.A. responded that he had eaten popcorn and water. He said he did not eat vegetables, fruit, or meat.
¶ 5 Emergency medical technicians (EMT) were summoned to the scene. Like the deputies, they noted S.A. could not stand under his own power. Initial health checks clocked S.A.'s heart rate at between 30 and 60 beats per minute. The emergency crew rushed S.A. to the hospital. Joe Hughes, captain of the EMT crew, testified later that S.A. was "the most malnourished and emaciated child I have ever seen." Report of Proceedings (RP) (12/17/07) at 68.
¶ 6 At Providence Everett Medical Center, a pediatric and internal medicine specialist determined S.A. was "strikingly malnourished." Id. at 71. Doctors determined S.A.'s *284 core temperature was only 87.1 degrees, a likely side effect of chronic malnutrition. He weighed about 26 pounds, severely underweight for his age. S.A.'s scalp was flaking, and his hair was thin and brittle. Doctors believed his body was consuming muscle to produce energy. His body was metabolizing its own tissue. His blood chemistry was highly irregular. When nurses fed S.A. in the hospital, he threw up undigested food because his stomach could not process the calories. Both the pediatric and internal medicine specialist, as well as a pediatrician at Children's Hospital, determined S.A.'s condition was life threatening.
¶ 7 During his recovery, S.A. told doctors that if he was discovered eating food, he would have to sleep in the bathtub. After doctors transferred S.A. to Children's Hospital, he expressed concern about eating during daylight hours. S.A. told doctors he could eat only when it was dark out. He hoarded food and tried to hide it from hospital staff.
¶ 8 The State charged Abegg and Mitchell with first degree criminal mistreatment. After a bench trial in December 2007, in which Abegg and Mitchell appeared as codefendants, the court entered a guilty verdict and applied an exceptional sentence of 96 months' incarceration. The court found Mitchell guilty "as charged in the information." Clerk's Papers (CP) at 24. Mitchell appealed to the Court of Appeals, which affirmed the guilty verdict. State v. Mitchell, 149 Wash.App. 716, 724, 205 P.3d 920 (2009). Mitchell filed for discretionary review here, arguing (1) her conviction violated due process because insufficient evidence existed to convict her of criminal mistreatment because a "child" cannot fit the statutory definition of a "dependent person" and (2) her exceptional sentence was improper. We granted review in part, 167 Wash.2d 1001, 220 P.3d 783 (2009), to decide only whether the terms "child" and "dependent person" are mutually exclusive within the meaning of RCW 9A.42.020(1).

ANALYSIS
¶ 9 The meaning of a statute is a question of law we review de novo. Lake v. Woodcreek Homeowners Ass'n, 168 Wash.2d 694, 229 P.3d 791, 795 (2010) (citing Rozner v. City of Bellevue, 116 Wash.2d 342, 347, 804 P.2d 24 (1991)). The State must prove beyond a reasonable doubt every essential element of a charged crime. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). To determine whether the evidence is sufficient to sustain a conviction, we view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. State v. Engel, 166 Wash.2d 572, 576, 210 P.3d 1007 (2009) (citing State v. Wentz, 149 Wash.2d 342, 347, 68 P.3d 282 (2003)). "It is mandatory that a conviction be made only under the offense charged." State v. Thompson, 68 Wash.2d 536, 541, 413 P.2d 951 (1966).
¶ 10 This case hinges on statutory construction. Our "fundamental objective in construing a statute is to ascertain and carry out the legislature's intent." Arborwood Idaho, LLC v. City of Kennewick, 151 Wash.2d 359, 367, 89 P.3d 217 (2004). We first look to the plain language of a statute. State v. Armendariz, 160 Wash.2d 106, 110, 156 P.3d 201 (2007). If the plain language is subject to only one interpretation, our inquiry is at an end. Id. When a "`statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent.'" Tingey v. Haisch, 159 Wash.2d 652, 657, 152 P.3d 1020 (2007) (quoting State v. Jacobs, 154 Wash.2d 596, 600, 115 P.3d 281 (2005)).
¶ 11 Washington's first degree criminal mistreatment statute provides:
A parent of a child, the person entrusted with the physical custody of a child or dependent person, a person who has assumed the responsibility to provide to a dependent person the basic necessities of life, or a person employed to provide to the child or dependent person the basic necessities of life is guilty of criminal mistreatment in the first degree if he or she recklessly, as defined in RCW 9A.08.010, causes great bodily harm to a child or *285 dependent person by withholding any of the basic necessities of life.
RCW 9A.42.020(1) (emphasis added).[1]
¶ 12 The legislature has defined some relevant terms in the statute. A "dependent person" means "a person who, because of physical or mental disability, or because of extreme advanced age, is dependent upon another person to provide the basic necessities of life."[2] RCW 9A.42.010(4) (emphasis added). A "child" means "a person under eighteen years of age." RCW 9A.42.010(3). The term "basic necessities of life" includes food, water, and health care. RCW 9A.42.010(1).
¶ 13 The legislature did not, however, define the word "disability," which determines if a person is dependent. We may rely upon the dictionary when statutory terms are undefined. Armantrout v. Carlson, 166 Wash.2d 931, 937, 214 P.3d 914 (2009). According to the dictionary, "disability" means the "inability to do something" or "deprivation or lack esp. of physical, intellectual, or emotional capacity or fitness" or "a physical or mental illness, injury, or condition that incapacitates in any way." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 642 (2002).
¶ 14 Evidence introduced at trial established that S.A.'s symptoms were consistent with these definitions of disability. When protective services assumed custody of S.A., the four-year-old boy weighed less than 26 pounds. Doctors measured his pulse at 30 to 60 beats per minute. His core temperature measured roughly 87 degrees. He could not walk or even stand up by himself when deputies performed the welfare check. His digestive system could not process food. S.A.'s bones had decalcified. His body tissue had wasted away. These physical ailments do not even address the mental issues he suffered, such as a likely eating disorder. In short, S.A. suffered a mental or physical disability.
¶ 15 The question, then, is whether a "child" who has a disability can also be a "dependent person" for purposes of RCW 9A.42.020(1). The statute sets out four classes of people who can commit criminal mistreatment: (1) parents of children; (2) people entrusted with custody of a child or dependent person; (3) people who assume responsibility to provide the basic necessities of life for a dependent person; and (4) people hired to care for a child or dependent person. This case concerns the third category. The State charged Mitchell as a "person who has assumed the responsibility to provide to a dependent person the basic necessities of life." CP at 26. By the plain language of the statute, criminal mistreatment applies to dependent persons when a caregiver assumes "the responsibility to provide ... the basic necessities of life." RCW 9A.42.020(1). Mitchell points out that the legislature did not include children in the caregiver category at issue here, as it did with categories one, two, and four.
¶ 16 The State argues that S.A., even though a child, also fits the dependent person group. It argues the terms are not mutually exclusive. Mitchell, on the other hand, contends the terms are mutually exclusive. She argues that because the information charged her with criminal mistreatment against a dependent personrather than a childthe evidence was insufficient to justify her conviction, and she was convicted of an uncharged offense.
¶ 17 Specifically, Mitchell claims omission of the word "child" from caregiver category three in RCW 9A.42.020(1)persons who have "assumed the responsibility to provide to a dependent person the basic necessities of life"is intentional and indicates the legislature's intent to not punish caregivers who fit into that category for mistreating children. She cites the canon of construction expressio unius est exclusio alterius.[3] Hand *286 in hand with this argument, Mitchell asserts "the specific definition of `dependent person' and `child' signifies the Legislature's intent that the terms refer to two separate and distinct groups of persons." Pet. for Review at 8 (citing State v. Roggenkamp, 153 Wash.2d 614, 625-26, 106 P.3d 196 (2005)). These arguments fail.
¶ 18 First, Mitchell misunderstands the canon of statutory construction. It might be true the legislature intentionally omitted children from the third caregiver category, but such an omission does not indicate that the terms are mutually exclusive. The omission means only that the State must show Mitchell mistreated a dependent person. Nothing in the statute indicates that by belonging to the "child" group, a disabled child cannot also belong to the "dependent person" group.
¶ 19 Second, Roggenkamp holds that different words have different meanings. It says nothing about whether the entities described by those different words are mutually exclusive. There is no doubt the statute establishes that the terms "dependent person" and "child" have different meaningsin fact, they are specifically defined differently in RCW 9A.42.010. This should not, however, be confused with establishing two separate and distinct groups of persons that cannot intersect. S.A.'s overlapping membership in both groups does not conflict with precedent or the plain meaning of RCW 9A.42.020(1).
¶ 20 If we were to bar children from the "dependent person" group, as Mitchell urges, a caregiver who assumes responsibility to provide for a disabled child could not be charged with criminal mistreatment. We would establish that a dependent person must be an adult only. Those who assume responsibility to care for a dependent person could not, by law, mistreat anybody under age 18. To omit disabled children, likely the most vulnerable group of victims, from this protection would seem a far cry from the legislature's intent in passing the criminal mistreatment statute.[4] It would border on the absurd. Nothing in RCW 9A.42.020(1) excludes children from the broader group of dependent persons.
¶ 21 Next, Mitchell asserts the term "child" would be superfluous and redundant if all children are dependent persons. But this misstates the case. Many persons under age 18 are not dependent persons. They do not have mental or physical disabilities. But some, such as S.A., are a dependent person and a child.[5] The plain meaning of the criminal mistreatment statute permits the prosecution of those who have assumed responsibility to provide to a dependent person the basic necessities of life when that dependent person happens to be a child.
¶ 22 Finally, Mitchell argues no evidence introduced at trial established S.A. was a dependent person, i.e., that the boy was disabled. She asserts that the court only found he was four years old. This argument has little merit. While it is true the trial court did not enter written findings of fact stating specifically that S.A. was disabled, in its oral findings of fact the court found S.A. could not walk or even stand up.[6] *287 See RP (12/19/07) at 416. The court further explained S.A. suffered from muscle wasting, demineralized bones, and a failing digestive system. Id. The court based these statements on testimony from S.A.'s doctors, first responders, law enforcement officers, and other witnesses who observed S.A.'s condition. This ample testimony adequately established that S.A. had a physical disability, which satisfies the definition of "dependent person." At the very least S.A. had an "inability to do something," and "a physical or mental illness, injury, or condition that incapacitates in any way." Webster's, supra, at 642. Significantly, he could not stand, walk, or digest food. Although the trial court did not make a specific finding that S.A. was a dependent person, the evidence introduced at trial clearly established he was.
¶ 23 When viewed in the light most favorable to the prosecution, a rational trier of fact could have found sufficient evidence to convict Mitchell of criminal mistreatment against a dependent person. The State proved the essential elements of first degree criminal mistreatment, as charged in the amended information, beyond a reasonable doubt.
¶ 24 We affirm the Court of Appeals.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON, GERRY L. ALEXANDER, TOM CHAMBERS, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, and DEBRA L. STEPHENS, Justices.
NOTES
[1] Criminal mistreatment in the first degree is a class B felony. RCW 9A.42.020(2).
[2] Residents of nursing and adult homes and frail elders or vulnerable adults, are presumed to be dependent persons under the statute. RCW 9A.42.010(4).
[3] The canon provides, "`Where a statute specifically designates the things or classes of things upon which it operates, an inference arises in law that all things or classes of things omitted from it were intentionally omitted by the legislature.'" State v. Swanson, 116 Wash.App. 67, 75, 65 P.3d 343 (2003) (quoting Wash. Natural Gas Co. v. Pub. Util. Dist. No. 1, 77 Wash.2d 94, 98, 459 P.2d 633 (1969)).
[4] Legislative intent is spelled out in RCW 9A.42.005, which reads in relevant part:

The legislature finds that there is a significant need to protect children and dependent persons, including frail elder and vulnerable adults, from abuse and neglect by their parents, by persons entrusted with their physical custody, or by persons employed to provide them with the basic necessities of life. The legislature further finds that such abuse and neglect often takes the forms of either withholding from them the basic necessities of life, including food, water, shelter, clothing, and health care, or abandoning them, or both. Therefore, it is the intent of the legislature that criminal penalties be imposed on those guilty of such abuse or neglect.
[5] Because we find S.A. was a dependent person based on his disabilities, we leave for another day the question of whether some children, by virtue of being under a certain age, are innately dependent persons.
[6] Written findings of fact are not required when a "court's comprehensive oral ruling is sufficient to allow appellate review." State v. Bynum, 76 Wash.App. 262, 266, 884 P.2d 10 (1994), review denied, 126 Wash.2d 1012, 892 P.2d 1089 (1995); see also State v. Clark, 46 Wash.App. 856, 859, 732 P.2d 1029, review denied, 108 Wash.2d 1014 (1987).