**FILED**

**May 24, 2016**

In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32671-3-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 32672-1-III) |
| | ) | |
| v. | ) | |
| | ) | |
| MICHELLE K. STAATS, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT A. STAATS, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Michelle Staats and Robert Staats were convicted of

second degree criminal mistreatment of their infant son, ELS.[1] They argue there is

insufficient evidence that they withheld food from ELS. For the reasons set forth below,

---

[1] We use initials to protect the privacy rights of minors.

we hold that intravenous (IV) nutrition is "food," and that "withholding" includes providing an insufficient amount. We determine there is sufficient evidence the Staats withheld food from ELS and affirm their convictions.

## FACTS

ELS was born to the Staats in December 2009, weighing seven pounds and two ounces. Like the Staats four other children, ELS was born at home. The Staats believe in natural medicine, and Michelle[2] distrusts modern medicine and hospitals. When ELS was approximately one, the Staats began to introduce him to solid foods. However, ELS developed a behavioral aversion to solid foods, which eventually caused him to gag and vomit at the sight of solid food. Michelle continued to breast feed ELS, but his weight began to decrease. The Staats believed ELS's food aversion was caused by various medical issues and digestive problems, and attempted to treat him with naturopathic and alternative medicine.

The Staats participated in the Women, Infants, and Children (WIC) program. Based on ELS's weight loss, WIC classified the case as "high risk." Clerk's Papers (CP) at 587, 952, 1205. WIC dietician Amanda Cramer met with Michelle and ELS multiple times throughout 2011. Ms. Cramer suggested that Michelle take ELS to a doctor to

---

[2] Throughout this opinion, we will sometimes refer to the defendants by their first names for clarity and readability.

2

evaluate his weight loss. Michelle indicated she would take ELS to Dr. Elizabeth

Trautman, a naturopathic practitioner, if ELS's condition did not improve. In August

2011, Michelle reported that ELS weighed 17 pounds and 8 ounces. Around this time,

ELS developed thrush, which worsened his ability to eat solid food. Nevertheless,

Michelle reported ELS weighed 18 pounds in the beginning of September, and 20 pounds

near the end of September. Michelle told WIC that ELS was gaining weight because of

natural remedies.

On October 26, 2011, Michelle took ELS to a WIC appointment. ELS's weight

was 15 pounds and 3 ounces, he looked very malnourished and lethargic, and his hair was

falling out. Michelle told Ms. Cramer that ELS was having difficulty eating because of

thrush, but she was giving ELS breast milk and vegetable broth. Michelle agreed to

thicken the vegetable broth, attend follow-up appointments with WIC, and to contact Dr.

Trautman if ELS did not begin to gain weight. The next day, Ms. Cramer told Michelle

she would refer the matter to Child Protective Services (CPS) if Michelle did not take

ELS to a medical professional.

On October 31, 2011, Michelle took ELS to an appointment with Dr. Trautman.

ELS weighed only 14 pounds and 13.5 ounces, and Dr. Trautman noted that he looked

emaciated. Dr. Trautman later told detectives that when she first saw ELS "he looked

like he was a leukemia patient." CP at 941. On November 4, 2011, Dr. Trautman met with both Robert and Michelle, and told them ELS had a serious condition that could be fatal if not properly treated. Although Dr. Trautman expressed that naturopathic care was not appropriate for ELS, the Staats indicated they would continue alternative remedies. WIC called Michelle around this time, and Michelle misinformed WIC that Dr. Trautman was satisfied with the Staats' home remedies.

Michelle continued to take ELS to Dr. Trautman through early November 2011. Although ELS gained a few ounces, by November 14, 2011, Dr. Trautman told Michelle that ELS needed to be hospitalized to receive nutrition intravenously. A report provided by Dr. Trautman to detectives indicated she told the Staats that ELS "'could die easily in this state,'" but "'Michelle is insistent that she will only use natural means at this time. . . . I advised Michelle again that [ELS] needed to be in the hospital where he could receive IV nutrition.'" CP at 917.

Despite Dr. Trautman's strong advice, the Staats did not take ELS to a hospital to receive IV nutrition. Instead, Michelle contacted a California based Qigong[3] practitioner, Dr. Effie Poy Yew Chow Ph.D. Dr. Chow never physically examined ELS, and Michelle

---

[3] "Qigong (pronounced chee gong) is a five-thousand-year-old form of Chinese energy healing for the body, mind and spirit." CP at 971. It focuses primarily on rhythmic breathing and meditation.

only consulted with Dr. Chow via telephone and e-mail. Michelle believed that Qigong was helping ELS; however, Michelle later told detectives that Dr. Chow also recommended that ELS receive IV nutrition. WIC called Michelle in late November 2011. Michelle informed WIC that ELS was still improving, but she agreed to come in for an appointment on February 24, 2012.

Two days before the February 2012 WIC appointment, Michelle canceled because she thought ELS did not look healthy enough to be taken out in public. In April 2012, ELS's condition worsened and he became unable to walk. The Staats continued to pray and research alternative medical remedies. By early May 2012, Robert felt the situation was becoming scary and dangerous. However, the Staats still did not take ELS to a hospital.

ELS suffered cardiopulmonary arrest on May 9, 2012. The Staats called 911, and emergency medical personnel were able to resuscitate ELS. In the emergency room, ELS presented as unresponsive, severely cachectic, emaciated, and obviously malnourished. Further, ELS's skin was thin and pale, his hair was sparse, his temples were sunken in, and his ribs protruded from his chest. At 29 months old, ELS weighed only 10 pounds. The emergency room physician diagnosed ELS with cardiopulmonary arrest, severe malnourishment, severe dehydration, severe hypothermia, and renal (kidney) failure.

5

ELS was airlifted to Sacred Heart Medical Center in Spokane. Detectives interviewed the Staats at Sacred Heart. Robert told detectives that he wished he and Michelle would have taken ELS to the hospital sooner. Robert further indicated that he tried to force the issue of medical intervention, but Michelle was resistant. Michelle told detectives she had been giving ELS vegetable broth and breast milk for nutrition. Michelle also stated she had to progressively thin the vegetable broth puree so ELS would not gag. In the interview, Michelle also indicated that she regretted not bringing ELS to the hospital sooner.

ELS was subsequently transferred to a long-term care facility. ELS has no brain activity. The malnutrition-induced cardiopulmonary arrest caused ELS to suffer the "devastating hypoxic ischemic brain injury, which he will never recover from." CP at 938.

The State charged both Michelle and Robert with criminal mistreatment in the first degree, criminal mistreatment in the second degree, and possession of less than 40 grams of marijuana. After unsuccessfully moving to dismiss the charges, the Staats agreed to a stipulated-facts bench trial. As part of the agreement, the State amended Robert's and Michelle's charges. The State amended Robert's charges to second degree criminal mistreatment, with an alleged aggravating circumstance that allowed the State to argue

6

for one day beyond the high end of Roberts' 12-month standard sentencing range. The State amended Michelle's charges to criminal mistreatment in the first degree, or in the alternative, criminal mistreatment in the second degree. In the original and the amended charges, the State specified that the mistreatment occurred on and between April 1, 2011, and May 9, 2012. During the bench trial, the State argued the Staats withheld medical treatment from ELS.

The trial court found both Michelle and Robert guilty of criminal mistreatment in the second degree. During the ruling, the trial court explained:

> There has been a great deal of investment in this case in the questions that circulate around it—getting or choosing not to get medical care. . . . I'm always a little hesitant to use a perspective of the case that is not argued by either side. . . . I don't believe this case is about medical care. . . .
>
> . . . This child did not suffer this terrible injury because of health care being withheld. He suffered it because he starved. The parents' conduct withheld food from this child. Now I know that Ms. Staats did all of these things to try to make sure that her child got proper nutrition. But that's what he didn't get. . . . He didn't get enough food. . . . Did it happen because he had an underlying disease or medical condition? We don't know. But what we do know is that the professionals who looked at him said he needs food. Now they said that in a different way. They may have said he needs to go to a hospital but for what? IV nutrition. In other words, he needs to get fed however you do that.

Report of Proceedings (RP) at 83-84. The trial court further stated, "What was withheld from this child was adequate nutrition." RP at 86. The trial court entered the following conclusions of law:

> 1. Michelle Staats and Robert Staats, and each of them, withheld from ELS one of the basic necessities of life, to wit, food.
> 2. Michelle Staats and Robert Staats, and each of them, by withholding nutrition (i.e., food) from ELS recklessly created an imminent and substantial risk of death or great bodily harm to ELS; and, recklessly caused ELS substantial bodily harm.

CP at 591, 1209. The trial court sentenced Michelle and Robert to six months of electronic home monitoring. Pursuant to agreement by the parties, the sentences were stayed pending this appeal.

On appeal, the Staats argue that there is insufficient evidence that they withheld food from ELS. Their argument has two components. First, the Staats argue that IV nutrition is not food. Second, they argue that because they continually fed ELS throughout the nearly 12-month charging period, there is no evidence they withheld food.

## ANALYSIS

A. *Standard of review*

The State must prove, beyond a reasonable doubt, every essential element of the crime charged. *State v. Mitchell*, 169 Wn.2d 437, 442, 237 P.3d 282 (2010); *accord In re*

8

*Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). On a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the State, and asks whether any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. *State v. Homan,* 181 Wn.2d 102, 105, 330 P.3d 182 (2014). "Specifically, following a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law." *Id.* at 105-06. Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the asserted premise. *Id.* at 106. Unchallenged findings of facts, along with findings of fact supported by substantial evidence, are verities on appeal. *Id.* Conclusions of law are reviewed de novo. *Id.* Finally, "[t]he label applied to a finding or conclusion is not determinative; we 'will treat it for what it really is.'" *The-Anh Nguyen v. City of Seattle,* 179 Wn. App. 155, 163, 317 P.3d 518 (2014) (quoting *Para-Med. Leasing, Inc. v. Hangen,* 48 Wn. App. 389, 397, 739 P.2d 717 (1987)).

B.      *Whether there is sufficient evidence that the Staats withheld food from ELS*

Both Michelle and Robert were found guilty of criminal mistreatment in the second degree. "A parent of a child . . . is guilty of criminal mistreatment in the second degree if he or she recklessly . . . (b) causes substantial bodily harm by withholding any

9

of the basic necessities of life." RCW 9A.42.030(1). In turn, RCW 9A.42.010(1) defines

"basic necessities of life" as "food, water, shelter, clothing, and medically necessary

health care, including but not limited to health-related treatment or activities, hygiene,

oxygen, and medication." The findings and intent provision of chapter 9A.42 RCW

states:

> The legislature finds that there is a significant need to protect children . . .
> from abuse and neglect by their parents . . . . The legislature further finds
> that such abuse and neglect often takes the forms of either withholding
> from them the basic necessities of life, including food, water, shelter,
> clothing, and health care, or abandoning them, or both.

RCW 9A.42.005.

The Staats argue that the evidence is insufficient to support their convictions for

criminal mistreatment in the second degree because the evidence does not establish they

withheld food from ELS. The Staats argue: (1) intravenous nourishment is not "food,"

and (2) they did not "withhold" food from ELS because they provided some food to ELS

throughout the charging period.

1.     Intravenous nourishment is "food"

"Food" is not defined in chapter 9A.42 RCW. The Staats argue that "the common

dictionary definition of food is things, substance, or something people eat. Eating is

taking food in by the mouth, chewing and swallowing the food." Br. of Appellant at 11.

10

This court reviews issues of statutory interpretation de novo. *Mitchell*, 169 Wn.2d at 442. The "purpose when interpreting a statute is to determine and enforce the intent of the legislature." *State v. Alvarado*, 164 Wn.2d 556, 561-62, 192 P.3d 345 (2008). "Where the meaning of statutory language is plain on its face, [this court] must give effect to that plain meaning as an expression of legislative intent." *Id.* at 562. To determine the plain meaning of an undefined term, this court may look to the ordinary definition of the term in a standard dictionary. *State v. Fuentes*, 183 Wn.2d 149, 160, 352 P.3d 152 (2015); *accord State v. Jackson*, 137 Wn.2d 712, 728-29, 976 P.2d 1229 (1999). Further, "'[t]he rule of statutory construction that trumps every other rule' is that 'the court should not construe statutory language so as to result in absurd or strained consequence.'" *State v. Mohamed*, 175 Wn. App. 45, 52, 301 P.3d 504 (2013) (internal quotation marks omitted) (quoting *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 971, 977 P.2d 554 (1999)). Reading a statute so as to avoid absurd results focuses on common sense. *Alvarado*, 164 Wn.2d at 562.

In our review of various dictionary definitions of "food," we note that "food" is defined narrowly or broadly. Narrowly defined, "food" is something that is eaten; it goes into the mouth, is chewed, and is then swallowed. Broadly defined, "food" provides nourishment to the body. As an example of the broad definition, "food" is defined as

11

"material consisting essentially of protein, carbohydrate, and fat used in the body of an organism to sustain growth, repair, and vital processes and to furnish energy." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 487 (11th ed. 2003).

Therefore, we must determine whether the narrow or the broad definition of "food" best effects the legislative goal. Here, the legislative goal goes beyond providing the child with food to eat. It extends to keeping a child alive. This goal is evidenced by the legislature's focus on providing a child with the "basic necessities of life." In those circumstances where the process of eating is insufficient to sustain a child's life, we believe that the legislature intended that a child's life be sustained nevertheless. We therefore broadly define "food" as including the receipt of nutrition intravenously, not just eating through one's mouth. We hold that "food" encompasses life-sustaining IV nutrition.[4]

### 2. "Provision" implies an *adequate* provision

The Staats argue that they did not withhold food from ELS, as they continued to feed him throughout the nearly 12-month charging period. Indeed, ELS did not starve

---

[4] The Staats argue that the rule of lenity requires this court to interpret the definition of "food" in their favor. The rule of lenity is applied only "[i]f there is no contrary legislative intent." *State v. Van Woerden*, 93 Wn. App. 110, 116, 967 P.2d 14 (1998). As explained above, the legislative intent establishes that "food" extends to nutrition, even when a child is not capable of receiving nutrition by eating.

quickly in a few weeks; rather, because he was given some food, it took months for his starvation to be sufficiently acute to result in a cardiopulmonary arrest and permanent brain damage. The Staats imply that the provision of any food, even inadequate, does not constitute criminal mistreatment. In making this argument, the Staats would create a hole so large in the statute that it would leave it without meaning: A thimble of water a day for thirst, a pair of socks in winter for warmth, or a cardboard box for shelter. We refuse to construe the word "withhold" so literally. Rather, a person "withholds" food, water, shelter, clothing, and medically necessary health care whenever the amount provided is so deficient that it results in the child suffering substantial bodily harm.

### 3. Sufficiency of the evidence

The Staats challenge their convictions based on the two arguments refuted above. They do not challenge any of the trial court's findings of fact. "Where there are findings of fact, as in a bench trial, unchallenged findings of fact are verities on appeal. Review is then limited to determining whether the findings of fact support the conclusions of law." *State v. A.M.*, 163 Wn. App. 414, 419, 260 P.3d 229 (2011) (citations omitted).

Here, the findings indicate that early in 2011, ELS developed an aversion to solid foods, and his weight began to drop. The trial court also found that in November 2011, a naturopathic practitioner told Michelle and Robert that ELS had a serious condition that

13

could be fatal if not properly treated. Finding of fact 19 establishes that shortly thereafter, the naturopathic practitioner told Michelle that ELS needed to be hospitalized in order to receive IV nutrition. However, instead of taking ELS to the hospital for IV nutrition, the Staats turned to Qigong as ELS starved. Six months after Dr. Trautman's warning to the Staats, ELS suffered malnourishment induced cardiopulmonary arrest, leaving him with permanent and significant brain damage. The record indicates the Staats only successfully gave ELS vegetable broth puree and breast milk during this timeframe. The unchallenged findings of fact, along with the evidence presented at the bench trial, support the trial court's finding (labeled as a conclusion) that the Staats "by withholding nutrition (i.e., food) from ELS recklessly created an imminent and substantial risk of death or great bodily harm to ELS; and, recklessly caused ELS substantial bodily harm." CP at 591, 1209.

Although the Staats were attempting to treat ELS through natural alternatives, their good intentions do not negate ELS's permanent and significant injury that resulted from him not receiving adequate food (i.e., nutrition) when IV therapy was available. *See State v. Williams*, 4 Wn. App. 908, 918-19, 484 P.2d 1167 (1971). "'Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full

14

and legal discretion when they can make that choice for themselves.'" *State v. Norman*, 61 Wn. App. 16, 23, 808 P.2d 1159 (1991) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S. Ct. 438, 88 L. Ed. 645 (1944)). Sufficient evidence supports the Staats' convictions.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Fearing, C.J.

Siddoway, J.

15