IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

          Respondent,

    v.

JOHN DAVIS ANDERSEN, JR.,

          Appellant.

No. 86089-5-I

DIVISION ONE

UNPUBLISHED OPINION

CHUNG, J. —  John Andersen was convicted of assault in the first degree and rape in the second degree, both with special verdicts finding the crimes were committed with deliberate cruelty. Andersen challenges his rape conviction for lack of sufficient evidence that J.E.F. was incapable of consent and as a violation of double jeopardy. We conclude there was no error and affirm his conviction.

FACTS

On September 8, 2022, J.E.F. went to his neighbor John Andersen's residence, a recreational vehicle (RV), to play cards. J.E.F. brought four beers to Andersen's RV and, while there, consumed about three beers and several shots of hard liquor. At that time, J.E.F. was taking the drug gabapentin for a recent surgery. J.E.F. and Andersen played about two card games before J.E.F. started to not feel well and decided to go home. J.E.F. reported that he was losing his "motor skills," and his card shuffles were "very lumpy shuffles rather than real smooth like [he's] used to." J.E.F. testified that he was "stumbling" as he was leaving Andersen's residence and that he was "not sure if

[he] was pushed or not" but that he "hit the ground" somewhere outside the front of Andersen's RV.

J.E.F. testified that he remembered Andersen "lifting [him] up by the waist and pulling [his] pants down," and that he yelled "stop, get off, what are you doing," and that he tried to crawl away but could not stand up. J.E.F. stated that after Andersen pulled his pants down, he remembered that he "was violated with the pipe," meaning the pipe was inserted into his anus. He stated that he was aware that the pipe was inside his anus because he was "able to glance over [his] shoulder, see [Andersen] holding it, and [Andersen] had this strange look on his face and he was laughing and giggling," and when asked who was holding the pipe, J.E.F. identified Andersen. J.E.F. described the pipe as gray and "two to three feet" in length. J.E.F. further testified that while the pipe was being inserted into his anus he "was losing consciousness," which he described as "one minute, [he] was engaged in the moment and knew it was going on, and then when [he] next became aware of the situation, things would be different as in [he] would be in a different place in the yard [and] was turned and stuff." J.E.F. testified that he attempted to scream but he could not physically leave.

J.E.F. explained that he regained consciousness behind a picnic table near Andersen's RV and was aware that his pants were still off but could not recall if any other objects had been inserted into his anus. J.E.F. again lost consciousness, and when he regained consciousness, he was closer to the RV and noticed that his whole body was wet and his pants, phone, and wallet were spread across the yard. J.E.F. testified that he was then able to crawl to his residence on his belly, before collapsing on the floor.

2

J.E.F. stated that his body felt destroyed and that he had "aches and pains, and felt [he] had been beat, and of course, [his] rear hurt something fierce, and [he] was bleeding" from his anus. He collapsed on the floor and fell asleep. After waking up, he was able to "sit on the toilet and bleed and wipe [himself] off head to toe with a washcloth." He explained that he made it through the first night, September 9, but that the next morning "it became obvious [ ] that [he] need[ed] some help," meaning medical attention. J.E.F. attributed his delay in seeking medical attention to "denial, shock, [and] disbelief." J.E.F. contacted emergency services to report that he was raped and was taken to EvergreenHealth hospital in Monroe. Officers from the Monroe Police Department (MPD) also responded to EvergreenHealth to meet with J.E.F. and to document his injuries.

Dr. Stephen Gardner, an emergency room physician at EvergreenHealth, treated J.E.F. on September 11. Dr. Gardner reported that J.E.F. had "a rectal perforation, he had pneumoperitoneum and pneumomediastinum and multiple healing abrasions." Dr. Gardner explained that pneumoperitoneum is abnormal air in the abdominal cavity and pneumomediastinum is abnormal air in the chest cavity. He further testified that J.E.F.'s bladder was swollen. Dr. Gardner explained that J.E.F.'s injuries were consistent with a "foreign body inserted into the rectum" with significant force. Dr. Gardner stated that in particular, the rectal perforation was not a very common injury and was concerning because it meant that "his bowels and stool [were] essentially flowing into his abdomen, which [would] cause infection which could be life-threatening," and would require treatment by a colorectal surgeon or specialized trauma surgeon at a different facility.

J.E.F. was transferred to Harborview Medical Center in Seattle, where he was treated by Dr. Erik Van Eaton. Dr. Van Eaton surgically placed a colostomy bag in J.E.F. and later discovered that he had a bladder injury, which required the surgical placement of a urinary catheter.[1] J.E.F. remained in the hospital for 10 days. At Harborview, J.E.F. also underwent an exam conducted by a sexual assault nurse examiner (SANE) sometime between September 13 and 14.[2]

On September 11, an MPD officer took Andersen into custody and he consented to an interview. Subsequently, a search warrant was issued for Andersen's residence. Several items were collected, including a large wooden dowel, a small wooden dowel, and a gray plastic pipe. The evidence taken from Andersen's residence was tested for blood, semen, saliva, and DNA. A forensic analyst found that the pipe was positive for blood and that a "single-source male DNA profile obtained from the staining on the interior of the plastic tube or pipe matches [J.E.F.]," specifically noting that it was "72 octillion times more likely to observe this DNA profile if it originated from [J.E.F.] rather than an unrelated individual." Other swabs of the pipe indicated that there may have been two contributors and that "it is 65 octillion times more likely to observe this DNA profile if it originated from John Andersen and [J.E.F.]" rather than from other individuals. The forensic analyst also tested the other evidence—a large wooden dowel and a smaller wooden dowel—finding similar staining and both J.E.F.'s and Andersen's DNA profiles.

---

[1] The record indicates that an "colostomy bag" is attached to a person's stomach to manually filter feces out of their intestines to allow the rectum to heal. And a urinary catheter is a tube that is inserted into a person's urinary tract to manually remove urine.

[2] The SANE nurse testified that a SANE nurse "respond[s] specifically to patients with reports of or concerns of sexual assault, and we tend to them by collecting evidence, documenting injuries, creating a document." A SANE also will "interview the patient… to get a sense of where we might find injuries or where we might find evidence."

In September 2022, Andersen was charged with rape in the first degree by forcible compulsion and assault in the first degree, with an aggravating circumstance that the crime was motivated by sexual gratification. The State amended the charges against Andersen twice. Ultimately, in October 2023, Andersen was charged with assault in the first degree with two aggravating circumstances, sexual motivation[3] and deliberate cruelty. He was also charged with rape in the second degree for engaging in sexual intercourse when the victim was incapable of consent by being physically helpless or mentally incapacitated, with an aggravating circumstance that the crime was committed with deliberate cruelty. After four days of testimony, the jury returned a verdict finding Andersen guilty of the rape and assault charges and special verdicts finding both crimes were committed with deliberate cruelty. However, the jury did not find that the assault was committed with a sexual motivation.

At sentencing, Andersen raised the issues of double jeopardy, same criminal conduct, and merger. The sentencing court concluded that Andersen's crimes were the "same criminal conduct for purposes of offender score calculation," but that his convictions did not merge and double jeopardy did not bar it from imposing separate punishments. Andersen was sentenced to 180 months for the assault conviction and an indeterminate sentence of 180 months to life for the rape conviction.

Andersen timely appeals.

---

[3] A jury can make a finding of an aggravated circumstance that an offense was sexually motivated, see RCW 9.94A.535(3)(f), this requires the jury to make a special finding pursuant to RCW 9.94A.835. Sexual motivation is defined as "one of the purposes for which the defendant committed the crime was for the purpose of [their] sexual gratification." RCW 9.94A.030(48).

DISCUSSION

Andersen challenges his conviction for rape in the second degree based on insufficient evidence that J.E.F. was incapable of consent. Andersen also challenges his convictions for both rape and assault committed with deliberate cruelty as a violation of double jeopardy. We address each claim in turn.

I.  Sufficiency of Evidence for Rape Conviction

Andersen argues insufficient evidence supports his conviction for rape in the second degree. Specifically, he claims the evidence was insufficient to prove that J.E.F. was incapable of consent. We disagree.

In a criminal trial, the prosecution must prove each element of a crime beyond a reasonable doubt. State v. Mitchell, 169 Wn.2d 437, 442, 237 P.3d 282 (2010) (citing In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)). A criminal conviction entered without sufficient evidence violates due process. Winship, 397 U.S. at 364. On appeal, for a challenge to the sufficiency of the evidence, a court "examine[s] the record to determine whether any rational finder of fact could have found that the State proved each element beyond a reasonable doubt." State v. Farnsworth, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016). For such claims, the defendant "admits the truth of all of the State's evidence," and the reviewing court views "the evidence in the light most favorable to the State, drawing reasonable inferences in the State's favor." Id. A reviewing court defers to the trier of fact regarding " 'issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.' " State v. Andy, 182 Wn.2d 294, 303, 340 P.3d 840 (2014) (quoting State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004)).

To convict Andersen of rape in the second degree, the State was required to prove (1) that he engaged in sexual intercourse with J.E.F. and (2) that at the time of the intercourse, J.E.F. was incapable of consent either because he was physically helpless or mentally incapacitated. Here, Andersen contends that the State failed to establish beyond a reasonable doubt that J.E.F. was either mentally incapacitated or physically helpless.

A person is "physically helpless" when they are "unconscious or for any other reason . . . physically unable to communicate unwillingness to an act." RCW 9A.44.010(12).[4] Andersen argues that J.E.F. was not unconscious or unable to communicate willingness as statutorily required because J.E.F. was able to testify to the incident, including his pants being taken off and his awareness of the pipe inserted in his anus.

As an example of insufficient evidence of "physical helplessness," Andersen cites to State v. Bucknell, 144 Wn. App. 524, 529-30, 183 P.3d 1078 (2008), where the victim had Lou Gehrig's disease[5] and was unable to move from the chest down but was able to speak and "perceive information." The Bucknell court held that the victim's "ability to communicate orally, despite her physically limitations," did not necessarily render her physically helpless, so the evidence was insufficient to support the defendant's rape conviction. 144 Wn. App. at 528-30. Andersen compares the victim in Bucknell, who

---

[4] Consistent with RCW 9A.44.010(12), the court instructed the jury that a person "is physically helpless when the person is unconscious or for any other reason is physically unable to communicate unwillingness to act."

[5] Amyotrophic lateral sclerosis.

could speak and "perceive information," to J.E.F., pointing to J.E.F.'s testimony that he made "very feeble attempts" to fight back and "tried to throw an arm back."[6]

However, here, unlike the victim in Bucknell, who could understand what was happening despite being unable to physically move, J.E.F. was unable to understand what was happening due to his intermittent unconsciousness,[7] even though at points he was screaming at Andersen to stop and "get off." J.E.F. testified that "one minute, [he] was engaged in the moment and knew [what] was going on, and then when [he] next became aware of the situation, things would be different as in [he] would be in a different place in the yard, was turned and stuff." J.E.F. could not recall precisely when Andersen inserted the pipe into his anus and was unaware that Andersen inserted other objects into his anus. We conclude that sufficient evidence is in the record for any rational finder of fact to find that the State proved beyond a reasonable doubt that J.E.F. was incapable of consent due to being physically helpless.

We also conclude sufficient evidence exists of the second alternative method of proving lack of capacity to consent, that J.E.F. was mentally incapacitated. A person is

---

[6] As an example of sufficient evidence supporting a conviction for rape where the victim was physically helpless, the State cites to State v. Krebs, No. 49396-9-II, slip op. at 11 (Wash. Ct. App. Dec. 4, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2049396-9-II%20Order%20 Amending%20Opinion.pdf. In Krebs, the court concluded that although the victim told the defendant to stop and "cried and screamed throughout the assault," she "had no memory of the night, passed out at least once, and was at times too intoxicated to communicate her unwillingness to engage in sexual intercourse." Krebs, No. 49396-9-II, slip op. at 11. While Krebs is an unpublished decision, pursuant to GR 14.1(c), we cite it as necessary for a reasoned decision.

[7] As an example of what is sufficient proof of an inability to consent due to mental incapacity or physical helplessness, the State analogizes to State v. Mohamed, 175 Wn. App. 45, 47, 301 P.3d 504 (2013). Mohamed dealt with the crime of indecent liberties, which provides that a person is guilty when they knowingly "cause[] another person to have sexual contact with [them] or another . . . when the other person is incapable of consent by reason of being mentally defective, mentally incapacitated, or physically helpless." See RCW 9A.44.100. The Mohamed court held that the victim was unconscious at the time the defendant began touching her vagina and thus was unable to consent when the defendant initiated sexual contact. 175 Wn. App. at 61. As rape in the second degree shares the same element of "inability to consent," Mohamed is instructive as to what constitutes proof of that element: when a person is unconscious for the initial contact, sufficient evidence supports an inability to consent.

8

"mentally incapaci[tated]" when a condition exists at the time of the offense that "prevents a person from understanding the nature or consequences of the act of sexual intercourse," which can be induced "by illness, defect, the influence of a substance or from some other cause." RCW 9A.44.010(7).

Several Washington courts have addressed what constitutes "mental incapacity." For example, in State v. Ortega-Martinez, the court explained that for a person to be mentally incapacitated, the condition impacting the victim must "meaningfully" impede their understanding of the nature and consequences. 124 Wn.2d 702, 711, 881 P.2d 231 (1994). There, the defendant was convicted of rape in the second degree of a woman with significant cognitive deficits; on appeal, the court held that sufficient evidence in the record supported his conviction under both the alternatives of forcible compulsion and incapable of consent due to mental incapacity. Id. at 705. Further, the Ortega-Martinez court disagreed with the lower court's conclusion that a person's ability to testify about their verbal or physical attempts to prevent a rape suggests they understood the nature and consequences of the act. Id. at 709-10. Rather, the court emphasized that "[i]t is important to distinguish between a person's general ability to understand the nature and consequences of sexual intercourse and that person's ability to understand the nature and consequences *at a given time and in a given situation*." Id. at 716 (first emphasis omitted, second emphasis added). Under the express language of the statute, " '[m]ental incapacity is that condition existing *at the time of the offense* which prevents a person from understanding the nature or consequences of the act of sexual intercourse.' " Id. (alteration in original) (quoting RCW 9A.44.010(4)).

9

Additionally, " 'influence of a substance,' such as alcohol or drugs, may render a victim incapable of giving consent." Nelson v. Duvall, 197 Wn. App. 441, 455, 387 P.3d 1158 (2017) (quoting RCW 9A.44.010(4)). For example, in State v. Al-Hamdani, the court held that the victim was "so intoxicated that she was unable to understand the nature or consequences of sexual intercourse at the time it occurred." 109 Wn. App. 599, 609, 36 P.3d 1103 (2001). There, the victim testified to having about 10 drinks and that she was "stumbling, vomiting and passing in and out of consciousness," which the court concluded rendered her debilitatingly intoxicated. Id. at 609.

Here, J.E.F. testified that while playing cards with Andersen, he drank about three beers and several shots of hard liquor. He also testified that he was taking gabapentin at the time of the incident, a drug that is known to cause tiredness, especially when mixed with alcohol. J.E.F. testified that he began to lose motor skills, was having difficulty shuffling the cards, and stumbled as he was leaving Andersen's residence. As the State contends, J.E.F.'s testimony about what he did recall during his intermittent periods of consciousness[8] is not dispositive of whether he had mental capacity to understand the incident, as the "understanding" required to show mental capacity must occur "at the time of the offense." See Ortega-Martinez, 124 Wn.2d at 716-17. J.E.F. also testified to being periodically unconscious and unaware of what was going on before and during the incident, and evidence also showed that the substances he consumed impeded his ability to meaningfully understand the nature and consequences of Andersen's actions that night.

---

[8] J.E.F. was later able to identify Andersen as the person who had violated him, was aware Andersen was using a pipe, and was able to describe his surroundings, including that he was first on asphalt and then later was moved to a grassier area.

Because we view "the evidence in the light most favorable to the State, drawing reasonable inferences in the State's favor," Farnsworth, 185 Wn.2d at 775, we conclude sufficient evidence exists from which any rational finder of fact could find J.E.F. could not meaningfully understand the incident due to mental incapacity. Thus, this evidence supports the conviction of rape in the second degree.

## II.  Double Jeopardy

At sentencing, Andersen argued that his convictions for both rape and assault implicated double jeopardy, the merger doctrine, and were the same criminal conduct. The State initially argued that when looking at the facts presented to the jury, it could not "distinguish a separate assault from a separate rape." However, it later amended its position, arguing that there was "no double jeopardy issue, [the crimes] do not merge, and they do not count as the same criminal conduct." Andersen argued that for purposes of double jeopardy, "there could not have been a first-degree assault without the rape," and as charged and as argued by the State to the jury, "there was one act alleged, both a rape and assault together." The sentencing court concluded that Andersen's crimes were the "same criminal conduct for purposes of offender score calculation," but that his convictions did not merge, so imposing separate punishments did not constitute double jeopardy.

On appeal, Andersen challenges the court's conclusion that his convictions for rape and assault did not constitute double jeopardy. Specifically, he contends that his insertion of objects into J.E.F., "(however slightly) constituted an act of penetration which was a completed rape," and that the State also relied on his "inserting a pipe

forcefully and deeply into the victim" to prove he acted with intent to cause great bodily harm, as required to prove the assault.

Criminal defendants have a constitutional right to not be put in jeopardy twice for the same offense. U.S. CONST. amend. V; WASH. CONST. art. I, § 9. The federal and state double jeopardy clauses extend the same protection. State v. Muhammad, 194 Wn.2d 577, 615-16, 451 P.3d 1060 (2019). Double jeopardy protects against duplicative trials and multiple punishments for the same offense, meaning the sentencing court cannot impose a punishment greater than what the legislature intended. Id. at 616. An alleged double jeopardy violation requires a reviewing court to determine whether the legislature intended to allow multiple punishments. Id. On appeal, the court reviews an alleged double jeopardy violation de novo. State v. Strine, 176 Wn.2d 742, 751, 293 P.3d 1177 (2013).

We look first at whether the language of the statute expressly authorizes multiple punishments for conduct violating several statutes. Muhammad, 194 Wn.2d at 617. Second, without explicit authorization, a reviewing court applies the Blockburger[9] or "same evidence" test. Id. at 617. In addition to the "same evidence" test, "the merger doctrine may help determine legislative intent, where the degree of one offense is elevated by conduct constituting a separate offense." State v. Kier, 164 Wn.2d 798, 804, 194 P.3d 212 (2008). Then, "even if two convictions would appear to merge on an abstract level under this analysis, they may be punished separately if the defendant's particular conduct demonstrates an independent purpose or effect of each." Id.

---

[9] Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

As to the first step, whether the statute expressly authorizes multiple punishments, Andersen argues that the assault statute, RCW 9A.36.011(1)(a), and the rape statute, RCW 9A.44.050(1)(b), do not explicitly or implicitly authorize cumulative punishments and are not instructive as to double jeopardy. The State notes that the offenses are in different chapters of the criminal code, which can indicate the legislature intended separate punishments. State v. Calle, 125 Wn.2d 769, 780-82, 888 P.2d 155 (1995). Regardless, the State concedes that the first step is not dispositive and that "it is appropriate to proceed to the second step" and consider the Blockburger "same evidence" test.

Under the "same evidence" test, "if the crimes, as charged and proved, are the same in law and in fact, they may not be punished separately absent clear legislative intent." State v. Freeman, 153 Wn.2d 765, 777, 108 P.3d 753 (2005). An offense is the same in law "when proof of one offense would also prove the other." State v. Martin, 149 Wn. App. 689, 699, 205 P.3d 931 (2009). Here, to convict Andersen of assault in the first degree, the jury had to find that Andersen (1) assaulted J.E.F.; (2) with a deadly weapon or by force or means likely to produce great bodily harm; (3) with intent to inflict great bodily harm. By contrast, to convict Andersen of rape in the second degree, the jury had to find that Andersen (1) engaged in sexual intercourse with J.E.F. (2) while J.E.F. was incapable of consent by reason of being physically helpless or mentally incapacitated.[10] Thus, the crimes are not the same in law.

An offense is the same in fact when it "arise[s] from the same act or transaction." Martin, 149 Wn. App. at 699. We "consider the elements of the crimes as charged and

---

[10] For both crimes, the State also charged and proved the same aggravating factor, that they were committed with deliberate cruelty under RCW 9.94A.535(3)(a).

13

proved, not merely as the level of an abstract articulation of the elements." Freeman, 153 Wn.2d at 777.[11] Andersen further notes that the Blockburger test is "not always dispositive of the question whether two offenses are the same," Calle, 125 Wn.2d at 780, and contends that here, the crimes were the same under the merger doctrine.

"The merger doctrine may help determine legislative intent, where the degree of one offense is elevated by conduct constituting a separate offense." Kier, 164 Wn.2d at 804. As our Supreme Court has explained,

> [T]he merger doctrine is a rule of statutory construction which only applies where the Legislature has clearly indicated that in order to prove a particular degree of crime (*e.g.*, first degree rape) the State must prove not only that a defendant committed that crime (*e.g.*, rape) but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes (*e.g.*, assault or kidnapping).

State v. Vladovic, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983).

According to Andersen, "[t]he core" of his double jeopardy claim "is that the offense of rape does not have any element of purpose of sexual gratification, and no sexual motivation finding was made."[12] Thus, he contends, because rape is complete upon "the mere act of insertion," the evidence of any additional harm "beyond penetration however slight" that "was able to be caused because of any unconsciousness of [J.E.F.] that fully enfeebled his ability to resist" was the same

---

[11] Andersen notes that double jeopardy may be violated even if the statutory elements of the crime differ if "as charged and proved," the crimes are "functional equivalent[s]," citing State v. Ralph, 175 Wn. App. 814, 824-25, 308 P.3d 729 (2013). However, other than citing and summarizing Ralph, Andersen fails to provide analysis explaining whether he is suggesting this test differs from the Blockburger test, or how such a test applies to the facts in this case. Andersen also cites to a case citing Ralph, State v. Gleason, No. 39014-4-II, slip op. at 8 (Wash. Ct. App. Feb. 1, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/390144_unp.pdf. However, we do not cite unpublished decisions "unless necessary for a reasoned decision." GR 14.1(c).

[12] The State charged the aggravating circumstance of sexual motivation; however, the jury rejected this argument and did not find that Andersen committed assault with a sexual motivation.

evidence—i.e., "the use of three instruments that caused the degree of injury"[13]—that was used to prove intent to cause great bodily harm as required for the assault charge.[14] Andersen posits that "the subsumed facts of deliberately cruel penetration" proving rape could not be separately punished from the assault with intent to cause great bodily harm.

However, "deliberate cruelty" is not an element of the underlying offense; it is an aggravating factor that supports a sentence above the standard range.[15] See State v. Gordon, 172 Wn.2d 671, 677-78, 260 P.3d 884 (2011) (statute containing aggravating factors does not define "deliberate cruelty," so failure to further define the term was not instructional error of constitutional magnitude). Instead, the proper focus here for the double jeopardy analysis is on the crimes of conviction themselves, not the aggravating circumstances.[16]

The rape charge required the State to prove that penetration occurred, but not that any of the objects inserted into J.E.F.'s anus resulted in great bodily harm. In its

---

[13] Wash. Court of Appeals oral argument, State v. Andersen, No. 86089-5-I (April 16, 2025), 4 min., 00 sec. to 4 min., 15 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025041298/?eventID=2025041298.

[14] In his briefing, Andersen described the evidence that was the same for both crimes as "the distance and force of the manner in which the pipe or objects were used against J.E.F."

[15] "Deliberate cruelty" requires proof that the defendant's conduct was gratuitously violent and " 'inflict[ed] physical, psychological, or emotional pain as an end in itself,' " which went beyond that typically inherent in the crime. State v. Gordon, 172 Wn.2d 671, 680, 260 P.3d 884 (2011) (quoting State v. Tili, 148 Wn.2d 350, 369, 60 P.3d 1192 (2003)).

[16] In support of his merger argument, Andersen cites only one unpublished case, State v. Humphrey, No. 54114-9-II, slip op. at 19-23 (Wash. Ct. App. Apr. 12, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054114-9-II%20Unpublished%20Opinion.pdf. The Humphrey court concluded that under the merger doctrine, as charged and argued, "the State essentially used the second degree assault conviction to elevate the rape to second degree rape because [the assault] provided the element of forcible compulsion," and, thus, the merger doctrine applied. Humphrey, No. 54114-9-II, slip op. at 21. Here, by contrast, the charged rape did not involve forcible compulsion. Andersen does not provide any argument as to how the merger doctrine applies here and how either crime—as opposed to an aggravating circumstance—was elevated by or subsumed within the other. Under RAP 10.3(a)(6), we need not consider issues where there is no argument or reference to the record.

closing argument, the State reminded the jury of all the evidence supporting each element of rape in the second degree and that no additional evidence was necessary. As to the first element—engaging in sexual intercourse—defined to mean "penetration, however slight," RCW 9A.44.010(14)—the State pointed to DNA evidence showing J.E.F.'s DNA on three objects and J.E.F.'s testimony about being penetrated by the pipe. As to the second element—that the penetration occurred while J.E.F. was incapable of consent—the State pointed to J.E.F.'s testimony about his poor motor skills, feeble attempts to fight back and his bouts of unconsciousness. The evidence of inability to consent included J.E.F.'s testimony that on the night of the incident, he was taking gabapentin and drank three beers and several shots of hard liquor. J.E.F. explained that as a result of his intoxication, he had poor motor skills and stumbled when he tried to leave Andersen's home. J.E.F. further testified that he was intermittently unconscious during the incident. This evidence proved J.E.F.'s lack of capacity to consent as required for rape in the second degree as charged, but was not used to prove the assault.

By contrast, to prove assault in the first degree, the State needed to show that Andersen intended to cause great bodily harm and committed the assault with a deadly weapon or with force likely to produce great bodily harm. In closing, to establish the element of assault by use of a deadly weapon or force likely to produce great bodily harm, the State highlighted Andersen's use of the three objects to inflict substantial damage to J.E.F. For example, as to the first element—assault of J.E.F.—the State elicited testimony about items collected from Andersen's home including a large wooden dowel, a small wooden dowel, and a gray plastic pipe, all of which tested

16

positive for J.E.F.'s DNA. As to the second element—use of means likely to produce great bodily harm—Dr. Gardner testified that a rectal perforation typically occurs when "some sort of foreign body [is] inserted into the rectum" with "a significant amount of force." Further, Dr. Van Eaton, J.E.F.'s surgeon, testified that "if [J.E.F.'s injury was] left untreated [he] was at risk of dying from" it. As proof of the third element—intent—the State pointed to the testimony of J.E.F.'s doctors about his injuries and the amount of force necessary to cause J.E.F.'s injuries. J.E.F.'s treating physicians and surgeons testified that his injuries, including a "rectal perforation," air in his chest and abdominal cavities, and a leak in his bladder that were consistent with a "foreign body inserted into the rectum" with significant force. Thus, the assault charge was not dependent on the number and type of objects used to effect the assault, whether it was one pipe or three different objects. Rather, the State relied on the fact that J.E.F.'s DNA was on each of those objects and testimony that suggested the objects were used in a manner to produce great bodily harm.

In sum, we agree with the State that the crimes of conviction here were not the same in law or fact, nor did the crimes merge. Rape in the second degree required proof that J.E.F. lacked capacity to consent. J.E.F.'s lack of capacity was not relevant to the assault charge, but instead was proof of the aggravating factor of deliberate cruelty. Further, the assault in the first degree required proof of great bodily harm, which was not required to prove the rape. Thus, under the Blockburger "same evidence" test,

convicting Andersen of both assault in the first degree and rape in the second degree did not constitute double jeopardy.[17]

We hold that sufficient evidence supports Anderson's convictions. We also conclude that his crimes of conviction are not the same in law and, as charged and argued, were not the same in fact. Nor does the merger doctrine apply. Accordingly, we hold that Andersen's convictions do not constitute double jeopardy.

Affirmed.

_Cheung, J._

WE CONCUR:

_Coburn, J._        _Mann, J._

---

[17] Andersen's argument under the rule of lenity also fails because he does not explain how the rule applies here, or how the State's presentation of the case created ambiguity as to the two separate charged offenses. Therefore, under RAP 10.3(a)(6), we need not consider this argument.